BEEF NEBRASKA, INC., a Nebraska Corporation, Petitioner,

v.

UNITED STATES of America, United States Department of Agriculture, Respondent.

No. 85-2534.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1986.

Decided Dec. 10, 1986.

---

Steven D. Johnson, Omaha, Neb., for petitioner.

Raymond W. Fullerton, Washington, D.C., for respondent.

Before FAGG, BOWMAN and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge.

Petitioner Beef Nebraska, Inc. ("Beef Nebraska"), a "packer" subject to the provisions of the Packers and Stockyards Act, 7 U.S.C. §§ 181–231 (1982 & Supp. III 1985) ("the Act"), petitions this court to set aside a decision and order entered November 26, 1985 by respondent United States Department of Agriculture ("USDA"), Donald A. Campbell, *Judicial Officer,* ordering Beef Nebraska to cease and desist from paying for livestock with checks drawn on remote, distant, or coun-

* Of the Second Circuit, by designation.

try bank accounts. The judicial officer held that Beef Nebraska's use of checks drawn on a distant bank to pay for livestock often lengthened the check-clearing process by at least one day, and hence delayed the "collection of funds" in violation of § 409(c) of the Act, 7 U.S.C. § 228b(c) (1982) ("§ 228b(c)"). In its petition, Beef Nebraska claims, first, that its use of checks drawn on the distant bank did not delay the "collection of funds" within the meaning of § 228b(c), and, second, that an administrative law judge, in denying its motions to require USDA to answer certain interrogatories, deprived it of its right to pre-hearing discovery under the United States Constitution and certain statutes and regulations.[1]

We hold that Beef Nebraska's use of checks drawn on the distant bank delayed the collection of funds in violation of the unambiguous proscription of § 228b(c). We further hold that the administrative law judge did not deprive Beef Nebraska of its right to obtain answers to its interrogatories, to whatever extent such right exists. We deny the petition for review and affirm the order.

## I.

Beef Nebraska conceded at oral argument before us that, if the judicial officer interpreted § 228b(c) correctly, the record before him contained sufficient evidence to support the conclusion that Beef Nebraska violated the Act. Beef Nebraska thus does not dispute the facts, but rather disputes the judicial officer's interpretation of § 228b(c). We summarize only those facts believed necessary to an understanding of the issues raised in the petition.

Beef Nebraska is engaged in the business of buying livestock in commerce for slaughter and sale. Hence it is a "packer" subject to the provisions of the Act. 7 U.S.C. § 191 (1982). Its sole processing plant is in Omaha, Nebraska. Its daily purchases of livestock average $305,000. They are from livestock sellers located throughout the midwestern United States.

The acts leading to the instant petition began in July 1982. At that time Beef Nebraska's use of a new checking account to pay livestock sellers often increased the period of time between the point at which it tendered a check to a seller and the point at which the seller had unconditional access to the funds pursuant to the check. Prior to July 1982, Beef Nebraska paid livestock sellers with checks drawn on its ordinary corporate account at the Omaha National Bank ("ONB"). In view of ONB's location in Omaha, the Federal Reserve System classifies it as a "city" bank. Livestock sellers paid with checks drawn on Beef Nebraska's ONB account would deposit such checks in their own banks. These banks often granted the sellers provisional credit. Provisional credit became final only after the checks cleared Beef Nebraska's ONB account. When a check drawn on that account was presented to the Federal Reserve Bank in Omaha ("the Federal Reserve Bank"), the check cleared at a time determined under Federal Reserve System schedules applicable to city banks. At that time the funds became available to the depositing bank. In general, under these schedules a check drawn on Beef Nebraska's ONB ordinary corporate account cleared on the same day that the check was presented to the Federal Reserve Bank. When the checks were presented to commercial clearinghouse associations—private collection systems with which ONB maintained agreements for such purposes—the checks cleared at least as quickly.

---

1. Beef Nebraska also claims that the judicial officer erred in taking notice of certain documents and that the order of the judicial officer was "overly broad" in that it purported to restrict the actions of Beef Nebraska's officers, directors, agents, and employees, who were not named in USDA's complaint. We hold that these claims are without merit. The judicial officer's order was not overly broad since it reached activities only "in connection with [Beef Nebraska's] operations as a packer". Cf. Bruhn's Freezer Meats v. USDA, 438 F.2d 1332, 1343 (8th Cir.1971). Even if the judicial officer erred in taking notice of the documents, Beef Nebraska has failed to show that the error was prejudicial. 5 U.S.C. § 706 (1982).

Presentments of checks drawn on the accounts of ONB's customers are made throughout the day at the Federal Reserve Bank. The same is true of checks presented to several commercial clearinghouse associations and by other banks directly to ONB. These numerous presentments prevent ONB from predicting accurately the value of checks which will clear against its customers' ordinary checking accounts on any given day. As a result, Beef Nebraska either had to maintain large idle balances in its checking account or had to pay overdraft charges on checks drawn on insufficient funds. To avoid this dilemma, Beef Nebraska opened a "controlled disbursement" checking account ("controlled account") at ONB on June 28, 1982. A check drawn on the controlled account appeared on its face to have been drawn on the State Bank of Palmer ("the Palmer Bank"), a small bank located in Palmer, Nebraska, 125 miles west of Omaha. In fact, however, pursuant to an agreement between ONB and the Palmer Bank, ONB would intercept the check at the Federal Reserve Bank, process the check, and debit its customer's controlled account. The Palmer Bank never received or processed the check. In view of its remote geographic location, the Palmer Bank is classified by the Federal Reserve System as a "country" bank. Under Federal Reserve System schedules applicable to country banks, a check drawn on the Palmer Bank generally cleared the day *after* it was presented to the Federal Reserve Bank. It therefore generally cleared one day later than did a check drawn on ONB, a city bank. The Palmer Bank was not a member of any commerical clearinghouse association. In view of its size and remote location, it did not receive direct presentments from other banks. ONB therefore could take advantage of the additional day between presentment and clearing to predict accurately the value of the checks that would clear the next day against its customers' controlled accounts.

On July 12, 1982 Beef Nebraska began paying livestock sellers with checks drawn on its ONB controlled account. Since those checks appeared to have been drawn on the Palmer Bank, Beef Nebraska gained an extra day in the check-clearing process. Concurrently, livestock sellers often faced a delay of one day between the time of deposit and the time they had final credit. During this period they could not collect the funds to which they were entitled pursuant to Beef Nebraska's checks.

On January 27, 1983 the Secretary of USDA ("the Secretary") served an administrative complaint on Beef Nebraska. 7 U.S.C. § 193 (1982). The complaint charged that its use of checks drawn on the Palmer Bank constituted an unfair practice under § 202(a) of the Act, 7 U.S.C. § 192(a) (1982), in that such use violated § 228b(c). Section 228b(c) provides that "[a]ny delay ... by a ... packer purchasing livestock, [in] the collection of funds as herein provided ... shall be considered an 'unfair practice' in violation of this chapter...."

A hearing on the complaint took place before an administrative law judge ("the ALJ") on September 27 and 28, 1983. 7 U.S.C. § 193. Prior to the hearing the ALJ denied motions by Beef Nebraska to require USDA to answer certain interrogatories. The ALJ's denial of these motions serves as the basis for Beef Nebraska's claim before us that its right to prehearing discovery was violated.

On April 3, 1985 the ALJ filed his decision and order requiring Beef Nebraska to cease and desist from paying livestock sellers with checks drawn on the Palmer Bank. On May 8, 1985 Beef Nebraska filed an appeal from the decision and order of the ALJ to the judicial officer. The Secretary had delegated authority to the judicial officer to make final decisions of the USDA. 7 C.F.R. § 2.35 (1986).

In a decision and order filed November 26, 1985, the judicial officer, after a comprehensive analysis of the language and legislative history of § 228b(c), concluded that Beef Nebraska's use of the controlled account delayed the collection of funds and hence constituted an unfair practice under the Act. The judicial officer also concluded

that the ALJ did not deprive Beef Nebraska of its right to discovery. He ordered that Beef Nebraska, "in connection with its operations as a packer, shall cease and desist from issuing checks in payment for livestock drawn on remote, distant, or country accounts including any accounts with [the Palmer Bank]...."

On December 31, 1985, Beef Nebraska petitioned this court to set aside the order of the judicial officer.

We deny the petition for review and affirm the decision and order of the USDA.

## II.

We turn first to the issue whether Beef Nebraska's use of checks drawn on the Palmer Bank resulted in a delay in the collection of funds within the meaning of § 228b(c).

Between 1958 and early 1975, 167 meatpackers went bankrupt, leaving sellers unpaid to the extent of more than $43 million worth of livestock. S.Rep. No. 932, 94th Cong., 2d Sess. 4–5, *reprinted in* 1976 U.S. Code Cong. & Ad.News 2267, 2271. This prompted Congress in 1976 to amend the Act to add, among other things, the "prompt payment" provisions of § 228b. Pub.L. No. 94–410, § 7, 90 Stat. 1250 (1976). Section 228b(a) sets forth methods and time limits for payment. A packer may pay a livestock seller in cash, by wire transfer, or by check. If payment is made by check, absent unusual circumstances the packer physically must deliver the check to the seller before the close of the business day following transfer of possession of the livestock. Section 228b(c), the subsection which we must interpret, provides in relevant part as follows:

"Any delay or attempt to delay by a ... packer purchasing livestock, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment for such livestock shall be considered an 'unfair practice' in violation of this chapter...."

7 U.S.C. § 228b(c).

The judicial officer concluded that the extra day of "float" resulting from Beef Nebraska's use of checks drawn on the Palmer Bank constituted "[a]ny delay ... by a ... packer purchasing livestock, [in] the collection of funds as herein provided". "Float" means the time between the point at which Beef Nebraska tenders a check to a seller and the point at which the seller has unconditional access to the funds.

As a general rule, we review the Secretary's determinations on questions of law under a *de novo* standard. *Rice v. Wilcox*, 630 F.2d 586, 589 (8th Cir.1980); *see* 5 U.S.C. § 706 (1982). When our review is of an agency's interpretation of a statute that it administers, however, the agency's determination often is entitled to some deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). Beef Nebraska argues that, for a variety of reasons, the judicial officer's interpretation of § 228b(c) is entitled to no deference. We need express no opinion as to the merits of that argument, for, regardless of any deference given the judicial officer's interpretation, Beef Nebraska's conduct comes so squarely within the unambiguous proscription of § 228b(c) that the order under review must be affirmed and the petition must be denied.

### A.

The Act does not define "collection of funds". "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979); *accord, Escondido Mutual Water Co. v. La Jolla Bank of Mission Indians*, 466 U.S. 765, 772 (1984) ("[I]t should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses".). In Webster's Third New International Dictionary 921 (1963), "fund" used as a noun in its plural form is defined as "money on deposit which is held at a specified place and on which checks or drafts can be

drawn". The same dictionary defines "collection" as, among other things, "the securing of payment of a check `... by presentation to the payer for cash". *Id.* at 444. *See also* U.C.C. § 4–105(d) (defining "Collecting bank" as "any bank handling the item for collection except the payor bank").

■ Thus, the ordinary meaning of the phrase "collection of funds" is the securing of payment of a check from money on deposit on which the check is drawn. By drawing checks on the Palmer Bank—located 125 miles from its sole processing plant—Beef Nebraska prolonged the time it took for a livestock seller to secure payment of Beef Nebraska's check from the account on which the check was drawn. The words of § 228b(c), therefore, when interpreted in accordance with their ordinary meaning, compel the conclusion that Beef Nebraska's use of the Palmer Bank "delay[ed]" the "collection of funds". Further, since the statute prohibits "any" delay, it is of no consequence that Beef Nebraska's use of the Palmer Bank resulted in a delay of only one day or that the delay did not always occur.

In the light of this unambiguous language, Beef Nebraska makes the rather remarkable assertion that § 228b(c) has "nothing to do with banking practices". It argues that, since "collection of funds" is followed by "as herein provided", "collection of funds" must be interpreted to be synonomous with "payment" as that word is used in § 228b(a). Under this interpretation, Beef Nebraska argues, actual delivery of a check within the time requirements of § 228b(a) is by definition "prompt payment" and hence cannot be characterized as a "delay" under § 228b(c) even if the check is drawn on a geographically-remote bank. This argument ignores well-established rules of statutory construction. We reject it. It is noteworthy that the phrase "collection of funds" appears only once in § 228b. By contrast, the word "payment" is used five times. We must "presume that the use of different terminology within a statute indicates that Congress intend-

ed to establish a different meaning." *National Insulation Transportation Committee v. ICC,* 683 F.2d 533, 537 (D.C.Cir. 1982). *Accord, United States v. Rice,* 671 F.2d 455, 460 (11th Cir.1982) (Congress' use of different verb forms is "properly take[n] as evidence of an intentional differentiation"); *Lankford v. Law Enforcement Assistance Administration,* 620 F.2d 35, 36 (4th Cir.1980) (same). Moreover, were we to adopt Beef Nebraska's construction of § 228b(c), the redrafted version which follows at best would create a redundancy, and at worst would make no sense:

"Any delay ... by a packer purchasing livestock, *payment,* or otherwise for the purpose of or resulting in extending the normal period of payment ... shall be an 'unfair practice'...."

■ Where, as here, a "statute admits a reasonable construction which gives effect to all of its provisions", we decline to "adopt a strained reading which renders one part a mere redundancy." *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307–08 (1961). *Accord, State of New York v. Shore Realty Co.,* 759 F.2d 1032, 1044 (2d Cir.1985). Under a reasonable construction, we hold that the phrase "as herein provided" does not change the ordinary meaning of "collection of funds", but rather directs that the delays in the "collection of funds" prohibited by § 228b(c) are those that occur with respect to checks delivered in accordance with § 228b(a).

We have considered carefully Beef Nebraska's other arguments based on the language and structure of § 228b. To accept them likewise would require us to adopt a strained reading of the statute contrary to its unambiguous language. We conclude that they are without merit.

### B.

■ Beef Nebraska argues that the legislative history of § 228b demonstrates that the judicial officer misinterpreted the statute. Ordinarily, when confronted with a statute such as § 228b(c) that is clear and unambiguous, we need not look to legislative history to ascertain its meaning.

*Maine v. Thiboutot,* 448 U.S. 1, 6 n. 4 (1980). Nevertheless, we have examined the legislative history cited by Beef Nebraska and conclude that it provides ample support for the judicial officer's interpretation.

Moreover, the legislative history of § 228b is rife with expressions of concern regarding the dangers caused by packers paying for livestock with checks drawn on remote banks. *E.g.,* H.R.Rep. No. 1043, 94th Cong., 2d Sess. 8 (1976) (noting complaints by livestock sellers of delays in payment resulting from "use of ... checks drawn on distant banks"); 122 Cong.Rec. 18,834 (1976) (statement of Sen. Dole) ("manipulation by using distant banks, coupled with other particular circumstances surrounding [bankruptcy of a packer] caused nearly 1,000 farmers to hold worthless checks amounting to over $20 million last year."); 122 Cong.Rec. 12,884 (1976) (statement of Rep. Harkin) ("The transgressions of [a bankrupt packer] have indicated that the packers can bend the law to serve their own interest at the expense ... of the producer. For example, [the bankrupt packer] maintained bank accounts in Seattle, Wash., and Salem, N.C., to increase the float time for clearing checks. Obviously this float ... resulted in the magnitude of the loss to producers.").

The unambiguous language of § 228b(c), coupled with its legislative history, makes clear that Congress intended to prohibit packers from extending float by drawing checks on banks located far from the packers' places of operation. Accordingly, we hold that Beef Nebraska's use of checks drawn on the Palmer Bank to pay livestock sellers resulted in a "delay" in the "collection of funds" within the meaning of § 228b(c).

### III.

Beef Nebraska claims that the ALJ, in violation of the United States Constitution and certain statutes and regulations, deprived it of its right to pre-hearing discovery in denying its motions to require USDA to answer interrogatories.

Beef Nebraska made four motions to require answers to interrogatories. The ALJ denied all four motions, each of which related to the same interrogatories. In denying the third motion, the ALJ stated that, although "[t]he record does not show relevancy or materiality at this time", and although "a search even to the outer limits of my imagination has failed in this respect", Beef Nebraska "will have further opportunity to present argument, offers of proof or evidence to show why the myriad aspects they raise are relevant and material."

Beef Nebraska argues that the ALJ's *"per se* denial of discovery" deprived Beef Nebraska of its rights. This argument need not detain us long. First, as the judicial officer stated in his decision, Beef Nebraska does *not* contend that it did not have pre-hearing access to all exhibits to be offered by USDA, lists of its witnesses and summaries of the witness' expected testimony. To label the ALJ's refusal to require USDA to answer interrogatories as a *"per se"* denial of discovery strikes us as a mischaracterization of the events that occurred before the ALJ. Second, an examination of Beef Nebraska's interrogatories shows that the ALJ was correct in his assessment of their relevance. The majority of the interrogatories appear to be designed to elicit information more relevant to enabling Beef Nebraska to choose sellers with whom to conduct future business or to determining why USDA was enforcing § 228b(c) than to allowing Beef Nebraska to prepare its defense. For example, one interrogatory asked USDA to "[s]tate the name of any ... company ... which has ... complained ... about Beef Nebraska's banking practices." Whatever may be Beef Nebraska's right to pre-hearing discovery, nothing required the ALJ to sift through the far-reaching motions in the hope of finding an interrogatory relevant to the preparation of Beef Nebraska's defense.

In light of Beef Nebraska's pre-hearing access to exhibits and witness lists and the irrelevance of its interrogatories,

we need not decide the extent to which the statutes and regulations on which it relies require an ALJ to compel answers to interrogatories that *are* material to a packer's preparation of its defense. In passing, however, it is noteworthy that the statutes and regulations relied on by Beef Nebraska have no such requirement. *See Fairbank v. Hardin,* 429 F.2d 264, 268 (9th Cir.) ("The Packers & Stockyards Act makes no provision for pre-trial discovery and the rules of practice governing proceedings under the act do not provide for discovery.") (footnote omitted), *cert. denied,* 400 U.S. 943 (1970). Similarly, we need not decide the extent to which the Constitution protects packers' right to answers to their interrogatories. *Compare Withrow v. Larkin,* 421 U.S. 35, 46 (1975) (due process requirement of fair trial in a fair tribunal applies to administrative agencies which adjudicate) *and McClelland v. Andrus,* 606 F.2d 1278, 1286 (D.C.Cir.1979) (before administrative agency, "discovery must be granted if in the particular situation a refusal to do so would so prejudice a party as to deny him due process.") *with Silverman v. Commodity Futures Trading Commission,* 549 F.2d 28, 33 (7th Cir.1977) ("There is no basic constitutional right to pretrial discovery in administrative proceedings.... Nevertheless the due process clause does require the fundamental fairness of the administrative hearing.") *and NLRB v. Interboro Contractors, Inc.,* 432 F.2d 854, 857–58 (2d Cir.1970) ("It is well settled that parties to judicial or quasi-judicial proceedings are not entitled to pre-trial discovery as a matter of constitutional right."), *cert. denied,* 402 U.S. 915 (1971). To whatever extent such a right exists, it clearly was not violated here.

Accordingly, we hold that the ALJ did not deprive Beef Nebraska of its right to obtain answers to its interrogatories, to whatever extent such right exists.

### IV.

To summarize:

Section 228b(c) makes "[a]ny delay ... by a ... packer purchasing livestock, [in]

the collection of funds as herein provided" an unfair practice under the Act. When interpreted in accordance with their ordinary meaning, the words of the statute proscribe acts by packers which extend the "float" on checks used to pay livestock sellers. Beef Nebraska's use of a geographically remote bank had just that effect. We therefore hold that its use of checks drawn on the Palmer Bank to pay livestock sellers resulted in a "delay" in the "collection of funds" within the meaning of § 228b(c). We hold also that the ALJ did not deprive Beef Nebraska of its right to answers to its interrogatories, to whatever extent such right exists.

Petition for review denied; order affirmed.