No. 95-3552

Midland Banana & Tomato          *
Company, Inc.; Robert S.         *
Heimann; Susan Heimann,          *
                                    *
          Petitioners,           *
                                 *
                                 *  On Petition for Review
                                 *  of a Decision of the
     v.                          *  United States Department
                                 *  of Agriculture
                                 *
United States Department         *
of Agriculture,                  *
                                 *
          Respondent.            *

Submitted: November 22, 1996

Filed: January 7, 1997

Before RICHARD S. ARNOLD, Chief Judge, MAGILL, Circuit Judge, and SACHS,[*]
     District Judge.

SACHS, District Judge

     This petition for review stems from consolidated Department of Agriculture disciplinary proceedings under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a et seq. (PACA), as amended, in which petitioner Robert Heimann was found to have committed repeated violations of the Act by failing to make full and prompt

---

[*]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting by designation.

payment for purchases of agricultural commodities and by making false and misleading statements on a PACA application. Heimann asserts that he was deprived of due process because the Department procedures were tainted by irrelevant, prejudicial evidence which biased the decisionmakers and because there was blanket adoption of adverse claims, unsupported by evidence. We conclude that Heimann's contentions are lacking in support, and we affirm.

## I.

The Perishable Agricultural Commodities Act was enacted to regulate the marketing of fresh and frozen fruits and vegetables in interstate commerce. See H.R. Rep. No. 87-1546 (1962), reprinted in 1962 U.S.C.C.A.N. 2749. Under the Act, all commission merchants, dealers and brokers in the perishable commodities industry are required to be licensed by the Department. 7 U.S.C. § 499c. All are subject to the Act, which declares certain conduct by commission merchants, dealers and brokers to be unlawful.

On August 25, 1993, the Director of the Fruit and Vegetable Division of the Agricultural Marketing Service, an agency within the Department of Agriculture, commenced a disciplinary proceeding against Royal Fruit Co., Inc. ("Royal") for alleged willful, repeated and flagrant violations of Section 2(4) of the Act, 7 U.S.C. § 499b(4), which makes it unlawful for any commission merchant, dealer or broker licensed under the Act to fail to make full and prompt payment in connection with any transaction in interstate commerce involving perishable agricultural commodities. On the same day, the Director commenced a disciplinary proceeding against Midland Banana & Tomato Co., Inc. ("Midland"), alleging that Midland violated Section 8(c) of the Act, 7 U.S.C. § 499h(c), which makes it unlawful for a PACA license applicant to make any false or misleading statements in a license application. The complaints against both companies alleged that both entities were "alter egos" of Robert Heimann, making Heimann individually responsible for the alleged violations.

2

The Royal and Midland cases were consolidated and on July 26, 1994, following a hearing, an administrative law judge (ALJ) found that Royal committed willful, flagrant, and repeated violations of the Act by failing to make full and prompt payment of over $500,000; that Royal was the alter ego of Heimann; that Midland had violated the Act by making false and misleading statements in its application for a PACA license; and that Midland was Heimann's alter ego.

Heimann (the only party now before us) appealed to the Department's Judicial Officer,[1] challenging the alter ego determinations in both cases. On August 16, 1995, in a lengthy and thorough opinion, Judicial Officer Donald A. Campbell adopted, with modifications, the ALJ's decision. This appeal followed.

## II.

In 1988, Robert Heimann purchased Royal, then a sole proprietorship, in an agreement that provided for Jeffrey Heimann, Robert's son, and Joseph Cali to manage the business.[2] Robert Heimann and his wife Beverly signed the contract for Royal's sale as purchasers. There is no evidence Robert Heimann ever gave or sold the business to Jeffrey Heimann or Joseph Cali.

Royal was licensed by PACA, however, as a partnership whose partners were identified as Joseph Cali, Jeffrey Heimann and Beverly Heimann. On November 21, 1988, Royal was incorporated and issued a new PACA license reflecting its corporate status. The listed directors, officers and shareholders were Cali, Jeffrey Heimann and Beverly Heimann. The license was terminated on

---

[1]The Secretary has delegated final administrative authority to the Judicial Officer to decide cases subject to 5 U.S.C. §§ 556 and 557. 7 C.F.R. § 2.35.

[2]Cali's role at Royal is referred to in related litigation. Conforti v. United States, 74 F.3d 838, 840-1 (8th Cir. 1996).

3

December 1, 1992, due to Royal's failure to pay the required annual renewal fee.

In May 1989, Robert Heimann became a consultant for Royal. Heimann's $10,000 per month fee was paid to Continental Oil & Gas Corp. ("Continental"), a non-operating entity Robert Heimann owned. After Robert Heimann formally joined the firm, Royal's business increased substantially. In December 1989, Royal purchased a new, larger location. The funds for this purchase and for improvements to the property were provided through a Small Business Administration loan secured by a mortgage on Robert and Beverly Heimann's personal residence. The lenders took Robert Heimann's management experience into account when deciding to approve the loan.

Robert Heimann was actively involved in Royal's management. He negotiated the purchase and sale of produce and arranged for its transportation. He appeared, to individuals dealing with the company, to be the person in charge of Royal's operations. Royal carried a "key man" life insurance policy on Robert Heimann and not on any other Royal employees.

When Royal began experiencing financial difficulties at the end of 1991, Robert Heimann allowed Royal to reduce his consulting fee to help keep the business solvent. During the first few months of 1992, Robert Heimann, through checks from Continental, provided Royal with a number of short-term, interest-free loans to cover Royal's checking account when Royal needed to pay suppliers quickly.

Between July 1992 and November 1992, Royal failed to make prompt payment to 21 sellers for produce purchased in the amount of $500,370.54. Royal ceased operations on November 17, 1992. That same day, Midland was incorporated. Midland's PACA license application identified Susan Heimann, Robert's daughter, an inexperienced college student, as its sole officer, director and

4

shareholder.  The funds used for Midland's initial capitalization came primarily from two of Robert Heimann's friends.  Susan Heimann invested $500 in the firm.  Robert Heimann served as general manager and was essentially responsible for all aspects of the operation.

Midland and Royal had almost identical operations.  Midland had the same address, telephone and facsimile numbers as Royal.  It used Royal's office and warehouse equipment.  It had the same customers as Royal and retained approximately one-third of Royal's employees.

Midland's PACA application asserted that Midland was not a successor to another firm.  The Judicial Officer found, however, that Midland had succeeded Royal.  He further found that Midland, in its application, had falsely denied that any employee had been the owner of a firm whose license is under suspension.  The Judicial Officer found that the license of Gilbert Brokerage Co., a company Robert Heimann had owned and operated in the 1970s, was under "ongoing suspension."  He additionally found the Midland application to be misleading because it concealed the identity of the true principal of the firm, Robert Heimann.

In concluding that Royal and Midland were alter egos of Robert Heimann, the Judicial Officer considered the witnesses' credibility to be critical.  He found that the testimony of Robert, his family members, and Joseph Cali, was not credible.  In so finding, he pointed to the fact that each of these individuals had misled authorities during the Department's investigation of the case.  He concluded that Robert Heimann had the least credibility.  To support this determination, he noted that Heimann had walked away from Gilbert Brokerage's disciplinary proceedings without producing required documents, had signed a number of fraudulent "State of Kansas Inspection Forms" while associated with another produce company, United KC, in the 1980s, and had structured a number of

transactions in a misleading manner, apparently in order to avoid financial responsibility. The Judicial Officer also found that Heimann's malfeasance prior to his involvement with Royal and Midland was relevant to the proceedings because it provided a motive for Heimann to disguise his true role in Royal's and Midland's operations.

Heimann asserts that consideration of these misdeeds was improper and tainted the opinions so that the ALJ and Judicial Officer were no longer neutral, unbiased decisionmakers. In support of this claim, Heimann contends the Judicial Officer uniformly credited the Agricultural Marketing Service position, even where the Department's findings were, he alleges, unsupported by or inconsistent with the evidence.[3] As a result, Heimann argues, he was not afforded the fundamental due process to which he is entitled.

### III.

We review federal constitutional questions de novo. United States v. Bates, 77 F.3d 1101, 1104 (8th Cir. 1996). Our determination is limited to whether introduction of the allegedly irrelevant evidence so prejudiced the Secretary that Heimann was denied the fundamental fairness required in administrative hearings by the due process clause of the Fifth Amendment. See Beef Nebraska, Inc. v. United States, 807 F.2d 712, 719 (8th Cir. 1986), quoting Silverman v. Commodity Futures Trading Commission, 549 F.2d 28, 33 (7th Cir. 1977).

This court has recognized the right to "a fair, unbiased, and impartial" administrative hearing. Local No. 3, United Packinghouse Workers v. NLRB, 210 F.2d 325, 330 (8th Cir. 1954), cert.

---

[3]The contention is unsound. For example, there was a rejection of contention that Jeffrey B. Heimann was the alter ego of Midland and that the payment of bills through Continental amounted to check-kiting.

denied, 348 U.S. 822 (1954).    Heimann considerably overplays his hand by suggesting that any uniform adoption of one party's proposed findings signifies "bias" and supports a conclusion that there has been a due process violation.[4]  Heimann's argument relies on NLRB v. Miami Coca-Cola Bottling Co., 222 F.2d 341, 345 (5th Cir. 1955), in which the court stated that such a practice by a trial judge or hearing examiner "deprives his credibility findings of the weight usually afforded them."  We agree that signs of superficial analysis invite closer scrutiny of the proceedings below; but this does not routinely or usually result in a reversal, much less a conclusion that there has been a violation of constitutionally mandated procedures.

There are occasions when the correct result is so obvious that a trial judge or hearing examiner may be less than completely thorough in express analysis.  As we have observed, this did not occur here.

We are not compelled by petitioner's briefing to address whether the challenged evidence was properly admitted.  Heimann simply assumes, without citation, that the evidence was inadmissible.  Additionally, because Heimann's sole argument on appeal is that he was denied due process, we need not analyze the Secretary's findings under the "substantial evidence" test.  We note, however, that we are satisfied the Secretary's decision was well supported by substantial evidence and believe the challenged evidence was admissible, at least to show motivation.  Fed. R. Evid. 404(b).

While it is thus not necessary to determine whether the proceedings before the Department were error-free, we note that the Department successfully responds to two claims of error that are emphasized before us. With respect to whether Heimann was still

---

[4]Occasional wording in the 122-page opinion that suggests irritation was fairly induced by the evidence.

under a cloud because of the Gilbert Brokerage affair in the 1970s, he contends there was a two-year limit on the suspension because of the failure to pay suppliers.  The Department contends, however, that there was an "ongoing suspension" pursuant to 7 U.S.C. § 499m(b) (last sentence) because Heimann never produced that company's records, and that such a suspension remains until and unless the records are produced.  As the Judicial Officer concluded, Heimann had "good reason to worry" that the Gilbert Brokerage experience would prejudice a new application in his own name.

With respect to his personal falsification of inspection certificates during the United KC activities, proof of such conduct was made in this case and Heimann simply declined to meet the issue, although he could have done so without waiving his claim of irrelevance.

Nothing has been presented that would approach a denial of Heimann's right to due process.

Accordingly, we affirm the decision of the Secretary.

Affirmed.

A true copy.

        Attest:


             CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.