UNITED STATES of America, ex rel. Stanley D. RABUSHKA; Stanley D. Rabushka, Individually, Plaintiffs/Appellants,

v.

CRANE COMPANY, Defendant/Appellee,

CF & I Steel Corporation, Defendant.

No. 93–3212.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 12, 1994.

Decided Nov. 16, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 19, 1995.

Robert L. King, St. Louis, MO, argued (Rex Carr, on brief), for appellants.

William H. Webster, Washington, DC, argued (Joseph S. Genova, David W. Harlan and John T. Walsh, on the brief), for appellee.

Before WOLLMAN, MAGILL, and BEAM, Circuit Judges.

WOLLMAN, Circuit Judge.

Stanley D. Rabushka brought this *qui tam* action against Crane Company ("Crane") and CF & I Steel Corporation ("CF & I") under the False Claims Act (the "Act"), 31 U.S.C. §§ 3729 and 3730. Finding that it was "based upon the public disclosure of allegations or transactions" relating to the alleged

fraud, the district court dismissed the suit for lack of subject matter jurisdiction pursuant to section 3730(e)(4) of the Act. Rabushka appeals that determination and alternatively seeks to amend his complaint to satisfy the jurisdictional requirements. We reverse and remand.

## I. Background

Crane spun off its subsidiary CF & I to shareholders in 1985. At that time CF & I's unfunded pension liability was stated at approximately $46 million. CF & I's financial condition worsened after the spinoff, in large part because of its burgeoning unfunded pension obligation. In November 1990, with an estimated $140 million unfunded pension liability, CF & I filed for bankruptcy. In March 1992, when the unfunded pension liability had grown to approximately $270 million, the Pension Benefit Guaranty Corporation ("PBGC") terminated CF & I's pension plan and assumed those plan obligations that were protected by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*

Rabushka, a Crane shareholder at the time of the spinoff, filed suit on February 28, 1991,[1] contending that his discussions with Crane executives at the time of the spinoff prove that the unfunded pension liability was fraudulently understated and that the CF & I spinoff was designed to shift Crane's pension responsibility to the PBGC.

## II. Discussion

Section 3730(e)(4) provides:

**(e) Certain actions barred.**

.     .     .     .     .

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or adminis-

trative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has provided the information to the government before filing an action under this section which is based on the information.

■ The Act's jurisdictional scheme is designed to promote private citizen involvement in exposing fraud against the government, while at the same time prevent parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud. *See United States ex rel. Precision Co. v. Koch Indus.,* 971 F.2d 548, 552 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993); *United States ex rel. Stinson v. Prudential Ins.,* 944 F.2d 1149, 1154 (3d Cir.1991). This sense of balance is reflected in the historical development of the Act. *See United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 649–51 (D.C.Cir.1994); *Stinson,* 944 F.2d at 1153–54. We have not yet specifically addressed the scope of the section 3730(e)(4)(A) jurisdictional bar in this circuit.

A. Public Disclosure of Allegations

■ The district court based its dismissal in part on statements made at a creditors' meeting following CF & I's bankruptcy filing. At that meeting, Frank Cummings, counsel for CF & I, said:

[T]here were what we believe to be miscalculations, putting the kindest possible face on it, by the actuary for this plan who was

---

1. Rabushka's initial suit was dismissed by the district court as premature because CF & I's pension fund plan had not yet been terminated by the PBGC. That dismissal was appealed, and during the pendency of the appeal the PBGC terminated CF & I's plan. The appeal was subsequently dismissed and remanded. Prior to the remand, however, Rabushka filed a second complaint at the district level. The two proceedings were consolidated into the instant proceeding.

retained by the former parent of the company, Crane. And those miscalculations—it is a pejorative term. Those calculations which did not display what we believe should have been displayed were not discovered until at or about the time of the spin-off which occurred in 1985.

The district court viewed this statement as tantamount to a public allegation of fraud.

Cummings also stated, however, that the rise in the unfunded pension liability after the spinoff was the result of a number of additional factors: actuarial assumptions, downsizing in the steel industry (where special early retirement benefits arise when facilities shut down), and discount rate changes all contributed to the massively underfunded debt. Moreover, Cummings also said that "[y]ou can be underfunded in this universe in any industry including steel simply by obeying the law" that allows a forty-year amortization period for the pension liability. When viewed in this context, Cummings' offhand remark, although hardly complimentary, is by itself insufficient to rise to the level of a public allegation of fraud on the part of Crane.

### B. Public Disclosure of Transactions

Several developments since the district court ruling assist us in analyzing the proper effect of the public disclosure of these transactions under section 3730(e)(4)(A).

In *Springfield*, pay vouchers and telephone records disclosed during discovery in an earlier suit were deemed insufficient to constitute "allegations or transactions" within the terms of the Act's statutory bar. 14 F.3d at 653–56. The *Springfield* court found the preclusive effect of section 3730(e)(4)(A) to apply only when "the critical elements of the fraudulent transaction themselves [are] in the public domain." *Id.* at 654. Because mere disclosure of the subject matter transaction was deemed insufficient to prevent a *qui tam* suit, *id.* at 653, the *Springfield* relator's additional disclosures alleging fraud in the vouchers and telephone records sufficed to surmount the statutory bar.

Another recent case, *Cooper v. Blue Cross and Blue Shield of Fla.*, 19 F.3d 562 (11th Cir.1994) (per curiam), involved a Government Accounting Office report that criticized a particular Blue Cross and Blue Shield of Florida ("BCBSF") payment monitoring plan and noted a potential conflict of interest. The report, however, did not allege any wrongdoing by BCBSF, so the court found it to "not constitute a 'public disclosure of allegations or transactions' that BCBSF knowingly violated" the law. *Id.* at 567. While it did not explain its analysis in detail, the court did not invoke the transactional aspect of the bar despite the fact that the hospital payments and monitoring plan detailed in the report were also the subject transactions of the relator's claim of fraudulent BCBSF conduct.

■ These intervening decisions persuade us that the district court's reliance on the mere disclosure of the "subject transactions" reads the jurisdictional bar too broadly. We agree with *Springfield* that the essential elements exposing the transaction as fraudulent must be publicly disclosed as well. *See* 14 F.3d at 654.

■ Crane relies on several articles published by the *Pueblo Chieftain* and other newspapers, CF & I corporate reports, and information disclosed at the creditors' meeting to support the proposition that the subject transactions were sufficiently disclosed to bar Rabushka's suit. While these disclosures publicly reveal Crane's spinoff of CF & I, as well as CF & I's growing unfunded pension woes and eventual bankruptcy, they do not raise the inference that Crane officials intentionally and fraudulently understated the pension problem in an attempt to avoid liability.

A May 1985 article in the *Chieftain* mentioned Crane's concerns about the pension liability and how the spinoff relieved Crane of that liability. The article does not, however, indicate that the liability was fraudulently understated. Nor does it impute any bad faith to Crane. In fact, the article was opti-

mistic about CF & I's future, describing "CF & I's recovery" and return to profitability in the hard-pressed steel industry. An April 7, 1985, *Sunday Chieftain & Star–Journal* article noted that the spinoff would leave both Crane and CF & I better off in the market, stating that it was "engineered to allow Crane to focus on its main areas of interest" rather than on the ups and downs of the steel market. These 1985 articles do not indicate at all that Crane was scheming to dump the pension liability on the government. Rather, the April article noted that CF & I was "in the black once more, thanks in large measure to Crane's earlier investments."

The news articles cited by Crane that appeared after the spinoff detail the discovery of the pension fund problems, but they still do not give rise to an inference of fraud on the part of Crane. A July 1990 *Chieftain* article noted that the pension liability was CF & I's "greatest stumbling block to profitability" and mentioned the termination discussions with the PBGC, but again does not indicate any intentional wrongdoing on the part of Crane or CF & I officials or expose the essential element of the fraud alleged by Rabushka.

■ Similarly, a November 8, 1990, article in the *Chieftain* detailing CF & I's bankruptcy filing and the PBGC's involvement does not indicate that Crane executives misled shareholders or the government when it spun off CF & I. That same article goes on to detail Crane's discovery as a result of a 1985 actuarial study that the annual pension bill was more than triple the original estimate. Although this clearly makes public CF & I's pension plan problems, it does not, either by itself or in conjunction with the other public disclosures cited by Crane, place the additional set of facts alleged by Rabushka—that

Crane officials intentionally understated the pension liability in an attempt to defraud the government—in the public domain. The article itself described CF & I's negotiations with the PBGC as "a good faith effort" to resolve the problems.

The same day as the November 8, 1990, *Chieftain* article, another article about CF & I's bankruptcy filing appeared in the *Denver Post.* This article, although cited by Crane, belies the theory that the subject transactions were adequately disclosed to bar the suit. The article mentioned that seven of the ten largest unfunded pensions assumed by the PBGC came from the steel industry and discusses the PBGC's fear of its own $1 billion deficit. If anything, this article raises the inference that the pension problems were part and parcel of the problematic steel industry and that involvement by the PBGC was more the result of industry economics than any fraudulent activity on the part of Crane.

■ Our analysis also holds true for the corporate reports [2] and creditors' meeting disclosures relating to the pension liability. Although CF & I's pension fund woes were squarely in the public eye prior to Rabushka's suit, the available information cited by Crane reports seemingly legitimate transactions and fails to suggest to the uninitiated reader the state of affairs alleged by Rabushka—that CF & I's pension liability was intentionally understated and that the spinoff was concocted in the hope that Crane would avoid eventual liability. Rabushka was the first to assert that Crane officials knew that the underfunding at the time of the spinoff was much greater than reported and that Crane officials were aware that the liability was sufficient to "sink" Crane if Crane was held responsible. Therefore, not "enough infor-

2. Our analysis of the level of disclosures sufficient to bar a suit holds equally true for both the news accounts and corporate reports. Corporate reports, however, are also insufficient as a jurisdictional bar to the action because they are not contemplated by the terms of the statute. *United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1499 (11th Cir.1991) ("the methods of 'public disclosure' set forth in section

3730(e)(4)(A) are exclusive of the types of public disclosure that would defeat jurisdiction under that section"); *see also United States ex rel. LeBlanc v. Raytheon Co.,* 913 F.2d 17, 20 (1st Cir.1990) (section 3730(e)(4)(A) "does not deny jurisdiction over actions based on disclosures other than those specified"), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991).

mation exist[ed] in the public domain to expose the fraudulent transaction" and invoke the jurisdictional bar. *Springfield,* 14 F.3d at 654; *see Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir.1992).

We do not require the public disclosure of a patently fraudulent transaction to bar a suit under the Act. Rather, the bar is given effect when the essential elements comprising that fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud. *See Springfield,* 14 F.3d at 655 (noting that the presence of only one state of facts in the public domain "cannot be expected to set government investigators on the trail of fraud"). Much as in *Springfield,* we "are confident in this case that the information put in the public domain ... did not present so clear or substantial an indication of foul play as to qualify as either an allegation of fraud or a fraudulent transaction." *Id.* at 656.

Our decision is also supported by the recognized purpose of the Act. Embracing too broad a definition of "transaction" threatens to choke off the efforts of *qui tam* relators in their capacity as "private attorneys general." *See Cooper,* 19 F.3d at 566. By allowing Rabushka's complaint to proceed beyond the jurisdictional inquiry, we help ensure that private actions designed to protect the public fisc can proceed in the absence of governmental notice of a potential fraud. *Springfield,* 14 F.3d at 655, 657. This is not the type of case that Congress sought to bar, precisely because the publicly disclosed transactions involved do not raise such an inference of fraud.

Because we conclude that the publicly disclosed "allegations or transactions" proffered by Crane do not encompass the essential element of the fraud alleged in Rabushka's complaint and therefore do not fit within the terms of the jurisdictional bar, we need not address whether Rabushka's allegation of fraud is "based upon" those "allegations or transactions." Nor need we address concerns about the original-source exception to the jurisdictional bar and Rabushka's proposal to amend his complaint in an attempt to meet that exception. *See id.* at 651; *Wang,* 975 F.2d at 1416.

The judgment is reversed, and the case is remanded to the district court for further proceedings.

MAGILL, Circuit Judge, dissenting.

I respectfully dissent. The majority frustrates the intent of Congress and ignores the lessons of history by opening wide the floodgates for the very "second toots" and parasitic lawsuits that Congress sought to prevent with 31 U.S.C. § 3730(e)(4)(A). Rabushka's *qui tam* action is the paradigmatic example of the parasitic actions that Congress sought to prevent; Rabushka has merely cobbled together allegations derived from newspaper articles, disclosures to the SEC and statements before the bankruptcy court. Moreover, although the majority pays lip service to *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645 (D.C.Cir.1994), it seriously misapplies and misinterprets that case. The majority misapplies *Springfield* by considering only selected portions of the public disclosures and then concluding that this artificially deflated amount of information was insufficient to trigger the jurisdictional bar of § 3730(e)(4)(A). The majority isolates each news article and completely ignores the most damaging disclosures before the SEC. The majority also misinterprets *Springfield* as requiring public disclosure of all the elements of a fraudulent transaction, when *Springfield* clearly states that the bar applies whenever there is a public disclosure of information "sufficient to enable [the government] adequately to investigate the case and to make a decision whether to prosecute." 14 F.3d at 654 (internal quotation and citation omitted). Because the voluminous public disclosures in the news, before the SEC and before the bankruptcy court were sufficient to, *and in fact did,* enable the government to investigate, I would affirm the

district court in all respects.[3] Because the panel has omitted many of the facts involved in this appeal, I will briefly state the pertinent facts omitted by the majority.

## I. OMITTED BACKGROUND

Crane acquired CF & I Steel Corporation (CF & I) in 1969, and after unsuccessfully trying to sell CF & I for over a year, Crane distributed its shares of CF & I as a dividend to Crane shareholders in May 1985. At the time of the spin-off, CF & I's unfunded pension liability was represented to be approximately $46.4 million, and CF & I's shareholder equity was represented to be almost $82 million. App. at 83, 86. On May 19, 1985, less than a week after the shareholder vote on the proposed spin-off, App. at 297, an article appeared in *The Pueblo Star–Journal and Sunday Chieftain*, stating that "[o]ne of the concerns that workers, and potential investors, have had is [CF & I's] pension liability, a major cost that will no longer be the responsibility of the much larger Crane Co." App. at 240.

Also in 1985, in connection with an unrelated SEC investigation concerning suspected insider trading in Crane securities, five Crane officers appeared before the SEC and testified extensively regarding Crane's motivation to spin CF & I off, CF & I's prospects for survival, and virtually every other aspect of Rabushka's claim. These hearings publicly disclosed [4] that: (1) before and during the spin-off, Crane knew that CF & I was financially troubled and unable to survive if spun off without long-term financing; (2) CF & I never obtained long-term financing; (3) a CF & I bankruptcy was virtually inevitable whether or not CF & I was spun off; (4) Crane would be responsible for CF & I's unfunded pension liability if CF & I was not

spun off and independent for some period of time; (5) Crane was in a hurry to spin CF & I off; and (6) Crane's motivation for quickly spinning CF & I off was solely to avoid liability for CF & I's unfunded pension obligations. In essence, Crane was publicly disclosed to be desperate to unload CF & I as quickly as possible in order to maximize its chance to avoid CF & I's significant unfunded pension obligations. These disclosures clearly establish Crane's motive for fraudulently concealing the true extent of CF & I's obligations in order to facilitate the spin-off. Although these SEC hearings contain several significant disclosures about the motives and knowledge of Crane, the majority inexplicably ignores them.

On July 2, 1985, Benjamin R. Jacobson testified before the SEC, stating that in February 1984, the Crane board of directors considered CF & I to be a liability and sought to avoid liability for CF & I's unfunded pension obligations in the event of a CF & I bankruptcy:

Q What did you value CF [ & ] I at per share of Crane common? This is as of February 28[, 1984]?

. . . .

A [Jacobson] Well, I would say that we probably were valuing CF [ & ] I at anything from a negative number to a number [based on negotiations for sale to U.S. Steel].

Q What was the basis of that valuation?

A Well, we did not spend a great deal of time analyzing CF [ & ] I. And the time we spent analyzing CF [ & ] I was more from a defensive standpoint in that we were concerned that [sic] the possibilities that CF [ & ] I would go bankrupt,

---

**3.** While I agree with the majority that the district court's application of the jurisdictional bar whenever there is disclosure of the "subject transactions" was too broad, I believe that "in its attempt to evade Scylla, [the panel majority has] steered precipitously close to Charybdis." *Springfield,* 14 F.3d at 650.

**4.** Disclosures made in testimony during a hearing before the SEC are public disclosures under 31 U.S.C. § 3730(e)(4)(A) ("No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a[n] . . . administrative hearing.").

and what claims or liabilities might kick back to the new holders of Crane shares.

And we thought that was a serious consideration or problem.

App. at 385–86.

On September 11, 1985, Robert S. Evans gave similar testimony before the SEC, disclosing that CF & I's impending bankruptcy was a major concern for Crane:

Q   Do you recall a discussion of CF & I at the meeting, at the February 27[, 1984] meeting?

A   [Evans] I can see, yeah, [the minutes refresh my recollection]—there's a point here it says a dividend with CF [ & ] I which, I guess, isn't on the agenda.  It's a spin-off of CF & I Steel.  I—in that discussion, I pointed out a number of problems with dividending CF [ & ] I at that time to the shareholders; one of them being that there was no long-term financing in place [for CF & I].  The company had a one to one current ratio, with no long term financing, or prospect of it, at that time.  Also, I think [the dividend] may have been ... taxable, instead of tax-free.  I may have expressed my opinion, which is one that I certainly have of giving the stockholders a taxable dividend in a bankrupt company wasn't doing them a favor.

App. at 377–78.

On September 20, 1985, Robert Joseph Slater testified that CF & I's obtaining long-term financing was the key to its survival:

Q   In addition to discussing how long it would take to dispose of CF & I, did you and R.S. Evans discuss whether it would be possible to dispose of CF & I?

A   [Slater] Yes.

Q   What do you recall being said in that respect?

A   Whether it would be possible to dispose, or to spin off CF & I as a viable entity realistically looking at its near term past performance and its negative cash flow.

Q   Did you express a view o[r] come to a view with R.S. Evans as to whether CF & I could be spun off from Crane Co. and become an independent entity?

A   Yes.

Q   What view did you express?

A   I felt that CF & I could become a viable, independent entity provided long term financing could be achieved.

Q   What did you mean by long term financing?

A   Financing of over one year.

Q   Did you mean cash to satisfy the shortfall in the cash flow, or cash for capital expenditures?   What did you mean?

A   I meant CF & I required a financing of significant amount to cover the shortfall in cash flow and to provide working capital.

Q   Did you express a view of the likelihood of CF & I obtaining such financing?

A   Yes.

Q   What view did you express?

A   I expressed the view that that would be a very difficult accomplishment.

Q   What view if any did R.S. Evans express regarding whether CF & I could be spun off as an independent entity?

A   I believe he shared that view.

Q   On what is that belief based?

A   My recollection of our conversation.

Q   Prior to the February [1984] Board meeting did you ever discuss with Mr. O'Brien whether CF & I could be spun off as an independent entity?

A   Yes.

Q   What view, if any, did you express to Mr. O'Brien?

A   The same view that I expressed to Mr. Evans.

Q   That CF & I would be viable if it could obtain long term financing, but that long term financing would be difficult to obtain?

A  That's correct.

Q  Did Mr. O'Brien express a view to you as to the possibility of spinning CF & I off as an independent entity?

A  Yes.

Q  What view did he express?

A  That CF & I could be spun off as a viable entity provided long term financing could be obtained.

Q  Was there any discussion as to whether CF & I could be spun off even if it was not a viable entity?

A  Yes.

Q  What do you recall about such discussions?

A  Well, if it was spun off and it was not a viable entity CF & I would go into bankruptcy, either Chapter 11 or 7.

App. at 402–04.

On October 3, 1985, Dwight Church Minton testified before the SEC, indicating that among his very few recollections was a recollection that spinning off CF & I was a "familiar" and "very lively" issue in 1984, and that because "CF & I was a huge source of losses to [Crane]," it was a "constant source of discussion." App. at 390–91. Minton also recalled that he had an "impression" that Thomas M. Evans thought it desirable to spin CF & I off, App. at 395, and that "there's a real question as to whether CF & I could last any length of time as an independent company, and should it fail to operate as an independent company for some length of time, which I don't recall, it could result in liabilities coming back to Crane, which would be an extremely serious matter. It was a huge issue in my mind because the operating losses had been so incredibly large." App. at 397.

On October 22, 1985, Thomas M. Evans testified concerning discussions at a December 1983 meeting of Crane's directors in which various directors expressed concern that CF & I was unable to obtain long-term financing:

Q  Was there any discussion as to whether CF & I had adequate long-term financing?

A  [Evans] There was never any—the credit was so bad you couldn't have—I don't even think it says long-term financing now. They're borrowing all the receivables and things like that. And that's the way it was going then.

App. at 367. Evans further testified that as a result of CF & I's poor financial condition, the effects of a CF & I bankruptcy were of great concern to Crane when it considered whether to spin CF & I off:

Q  Did you participate in any discussion prior to the February [1984] board meeting as to what if anything would be the consequences if CF & I ... went into bankruptcy?

A  Yes, I went over the law on that, I think, with Mr. Queenan, and if it went into bankruptcy in a very short time, Crane would have been li[able]. If it stood on its own for a longer period of time, it would be out under its own. I don't remember if it was six months or 12. Something like that.

. . . .

Q  And did anyone express concern regarding the consequences to Crane Co. if CF & I went bankrupt within—

A  If CF & I were what?

Q  If CF & I did go bankrupt within a short time after the spin[-]off?

A  It's obvious, if it was a subsidiary to Crane they would be li[able]. The only thing is if they got rid of it, you wouldn't be li[able] if it stayed a certain time.

Q  And was there—

A  It was certainly to Crane's advantage to spin it off promptly.

App. at 367–69. Prompt spin-off was advantageous because the directors and potential lenders knew that CF & I "wasn't in strong financial shape." App. at 369–70. T.M. Evans further testified that the entire reason

for the decision to spin CF & I off was to avoid liability for CF & I's unfunded pension obligations:

> Q  Do you recall any discussions you had with anyone regarding to [sic] any pension issues relating to the spin[-]off of CF & I?
>
> A  Pension?
>
> Q  Pension.
>
> A  Yes, that's the whole thing we were talking about.  The liability if the pensions were unfunded would come back on Crane, unless you'd have been spun off for a certain length of time.
>
> Q  I see.  That was a specific bankruptcy concern?
>
> A  Yes.

App. at 370–71.

After being spun off, CF & I lasted longer than anyone anticipated.  However, due to its rapidly growing unfunded pension liability [5] and continued operating losses, *see* App. at 242, 244, 245, CF & I revealed that it might not be able to meet its minimum pension fund contribution in September 1990, and entered into negotiations with the Pension Benefit Guaranty Corporation (PBGC) in an attempt to "restructure the pension obligation."  App. at 270a.  From May through September, speculation about the future of CF & I and its pension plan generated several news articles that detailed the nature of CF & I's pension obligations and the underfunding of these obligations, often speculating about the reasons for the underfunding.  App. at 243, 245.  One of these articles speculated that CF & I might try to shift these obligations to the PBGC.[6]  App. at 244.  Other articles reported rumors that the pension plan was being terminated and discussed the effects of such a termination.  App. at 246–47.

CF & I was in fact unable to make its minimum pension fund contribution in September 1990, and as a result, on November 7, 1990, CF & I filed for Chapter 11 bankruptcy.  This filing caused quite a stir in the local media, and several news articles detailing the financial woes of the company appeared during early November.  App. at 251–56.  It was during bankruptcy proceedings initiated by this petition that Cummings made his "hardly complimentary" statement about Crane's "miscalculations."  Meanwhile, as a result of this flood of publicity, the PBGC became suspicious and began an investigation of Crane sometime prior to Rabushka's filing suit.  App. at 307–08.

Rabushka filed his first False Claims Act (FCA) complaint against Crane and CF & I on February 28, 1991.  The district court dismissed this action as unripe because the PBGC had not yet assumed CF & I's unfunded pension obligations, and therefore no obligation on the part of the United States to pay out sums of money, as required for a FCA claim, had arisen.  Rabushka appealed the dismissal to this court.  While the appeal was pending, the PBGC terminated the pension plan, thereby assuming responsibility for CF & I's unfunded pension obligations.  Accordingly, we dismissed the appeal and remanded the case to the district court.  On March 20, 1992, Rabushka filed a second FCA complaint against Crane (but not CF & I) that included the allegations of the first complaint and added allegations concerning the termination of the pension plan by the PBGC.  These two cases were consolidated by the district court, and an order to dismiss was entered on June 1, 1993.[7]  On June 18, Rabushka moved to amend the complaint,

---

5.  CF & I's 1986 Annual Report indicates that unfunded pension liability was approximately $55.6 million in 1985.  The same report indicates that by 1986, this figure had increased to $120.5 million.  By 1989, CF & I revealed that this figure had risen to $134 million.  In 1990, the PBGC calculated CF & I's unfunded pension obligation to be $152 million.  By 1992, these liabilities had mushroomed to about $270 million.

6.  If CF & I was unable to satisfy its obligations, the obligations would fall on either the PBGC or Crane, as CF & I's (former) parent.

7.  Crane is the only party defendant in these consolidated actions that has been served.

and the district court denied the motion. As the majority notes, this appeal is from the two consolidated actions.

## II. DISCLOSURES TO THE SEC, THE BANKRUPTCY COURT AND IN THE NEWS MEDIA CONSTITUTE A "PUBLIC DISCLOSURE OF ALLEGATIONS OR TRANSACTIONS"

### A. Congressional Intent and History of the *Qui Tam* Provisions of the False Claims Act

Any attempt to interpret the *qui tam* provisions of the FCA must begin with the history of that Act, for "[t]he past serves as prologue; some familiarity with their tortuous, wending history is critical to an understanding of the latest set of amendments to the *qui tam* provisions." *Springfield,* 14 F.3d at 649. The history of the *qui tam* provisions has largely been one of "[s]eeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Id.; see also United States ex rel. Precision Co. v. Koch Indus.,* 971 F.2d 548, 552 (10th Cir.1992) (noting dual purpose of *qui tam* provisions of FCA), *cert. denied,* —— U.S. ——, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993).

Section 3730's *qui tam* provisions originated from the False Claims Act of 1863, which was enacted due to "the gravity of the consequences which resulted from unscrupulous contractors supplying inferior goods to the Union military when the Government's resources were too strapped by the war effort to enable effective prosecutions of these crimes." *John T. Boese, Civil False Claims and Qui Tam Actions* 1–7 to 1–8 (1993); *see* S.Rep. No. 345, 99th Cong., 2d Sess. 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273. The *qui tam* provisions of the 1863 Act were:

passed upon the theory, based upon experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel.

*United States v. Griswold,* 24 F. 361, 366 (D.Or.1885). Senator Howard, the bill's sponsor, put it a bit more succinctly, noting that the *qui tam* provisions were effective because they "set[ ] a rogue to catch a rogue." *Boese, Qui Tam Actions* 1–8. Although the *qui tam* provisions under the FCA of 1863 were quite generous, they remained largely unused due to the lack of any governmental involvement in the economy comparable to the military buildup associated with the Civil War. *Id.* at 1–9 to 1–10. All this changed with the enactment of New Deal legislation and the military buildup associated with World War II. *Springfield,* 14 F.3d at 649; *Boese, Qui Tam Actions* 1–10. Government contracts boomed, and with them opportunities for government contractors to profit through fraud. *Springfield,* 14 F.3d at 649; *Boese, Qui Tam Actions* 1–10.

*Qui tam* actions correspondingly surged, reaching their zenith in 1943, when the Supreme Court decided *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). In *Hess,* the government had filed fraud indictments against several electrical contractors. Morris L. Marcus, an enterprising if unscrupulous *qui tam* relator, obtained a copy of one of these indictments and copied the allegations directly into his complaint in an action brought under the *qui tam* provisions of the 1863 Act. The Supreme Court, noting the absence of any impediment to Marcus's suit in the text of the 1863 Act, and finding no intent to impose such an impediment in the legislative history of the 1863 Act, declined to establish such a bar on its own initiative. *Id.* at 546. Marcus was thus able to claim half of any resulting civil judgment.

The decision in *Hess* brought quick opposition from the Attorney General, who sought

outright repeal of the *qui tam* provisions. There was considerable resistance to repeal, however, and the result of this tug of war was a compromise. S.Rep. No. 345, 99th Cong., 2d Sess., at 11–12, *reprinted in* 1986 U.S.C.C.A.N. at 5276–77. This compromise was embodied in the 1943 amendments which provided:

> The court shall have no jurisdiction to proceed with any such [*qui tam*] suit ... or pending suit brought under [this section] whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.

Pub.L. No. 78–213, 57 Stat. 608, 609 (1943) (codified as 31 U.S.C. § 232 (1976)) (superseded). These amendments led to decreased use of the *qui tam* provisions, but as government involvement in the national economy expanded, so did the number of FCA suits. *Boese, Qui Tam Actions* 1–12 to 1–13.

Two lines of jurisprudence developed from these suits. First, a test for determining the amount of information that must be in the government's possession to activate the jurisdictional bar was developed. *See, e.g., Pettis ex rel. United States v. Morrison–Knudsen Co.,* 577 F.2d 668, 673–74 (9th Cir.1978); *United States ex rel. Weinberger v. Florida,* 615 F.2d 1370, 1371 (5th Cir.1980); *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1377 (D.C.Cir.1981), *cert. denied,* 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982); *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100, 1103–04 (7th Cir.1984); *United States ex rel. MacFarlane v. Hutchinson,* 519 F.Supp. 563, 564–65 (D.Colo.1981). Second, courts uniformly held that the absence of an "original source" exception to the jurisdictional bar precluded *qui tam* actions by individuals, even if those individuals were the original source of all information in the government's possession. *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1419 (9th Cir.1992). The Senate version of the 1943 amendments contained an original source exception to the jurisdictional bar, but this provision was deleted from the confer-

ence report without any explanation. S.Rep. No. 345, 99th Cong., 2d Sess., at 12, *reprinted in* 1986 U.S.C.C.A.N. at 5277; *Springfield,* 14 F.3d at 650. The most extreme example of this second trend was the *Dean* case. In an attempt to reach the mean between the two extremes represented by *Hess* and *Dean,* Congress enacted the 1986 amendments which we now interpret.

The legislative history of the 1986 amendments specifically mentions the *Dean* case, noting that in *Dean:*

> the Court refused to allow the State of Wisconsin to act as a *qui tam* relator in a Medicaid fraud action even though the investigation had been conducted solely by the State of Wisconsin. The Court found that the Federal Government was in possession of the information due to the State disclosures of the fraud to the Department of Health and Human Services. The State was required to make such disclosures under Federal law governing Medicare programs. Interestingly, the Federal Government in this case not only declined to intervene and take over the suit, but filed a brief with the Court indicating its belief that Wisconsin was a proper relator. In rejecting the views of both the Federal Government and the State of Wisconsin, the Court noted that:

> > If the State of Wisconsin desires a special exemption to the False Claims Act because of its requirement to report Medicaid fraud to the federal government, then it should ask Congress to provide the exemption. [*Dean,* 729 F.2d] at 1106.

S.Rep. No. 345, 99th Cong., 2d Sess., at 12–13, *reprinted in* 1986 U.S.C.C.A.N. at 5277–78. The *Dean* case fits squarely within both trends. *Dean* held that: (1) the quantum of information in the possession of the government was sufficient to trigger the jurisdictional bar, *Dean,* 729 F.2d at 1103–04, and (2) the jurisdictional bar contained no implied original source, or state source, exception, *id.* at 1104–07. The Senate Report mentions only the latter holding. The quote found in

the Senate Report was taken directly from the portion of *Dean* that discussed the lack of an original source exception. While both the plain language of the statute and the legislative history demonstrate a clear intent to reverse this aspect of *Dean*, Congress manifested no such intent regarding the first holding of *Dean* and the numerous other cases following *Pettis*. *See Wang*, 975 F.2d at 1419 (noting that the restrictive interpretation that barred suits by original sources was "too much for Congress"); *United States ex rel. Hartigan v. Palumbo Bros.*, 797 F.Supp. 624, 629 (N.D.Ill.1992) (noting congressional dissatisfaction with "original source" aspect); *Erickson ex rel. United States v. American Inst. of Biological Sciences*, 716 F.Supp. 908, 917 (E.D.Va.1989) (noting that original language of Senate bill broadened jurisdictional bar, but added original source provision).[8]

We presume that Congress acts with knowledge of existing law. *Estate of Wood v. C.I.R.*, 909 F.2d 1155, 1160 (8th Cir.1990). This is especially true where, as here, the law with which we presume familiarity consists of a case cited in the legislative history. Thus, when interpreting the statute, we must consider it in light of the judicial concepts existing before it was enacted. *Estate of Wood*, 909 F.2d at 1160. "[A]bsent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction." *Estate of Wood*, 909 F.2d at 1160 (internal quotation and citation omitted). Here, Congress changed the text of the jurisdictional bar from a bar of actions "based

upon evidence or information in the possession of the United States, or any agency, officer or employee thereof," to a bar of actions "based upon the public disclosure of allegations or transactions." Although this is certainly a change in the formulation of the applicable standard, the statutory text and legislative history are both silent concerning the effect of the amendment on the standard itself, *i.e.*, the quantum of information that must be disclosed to activate the jurisdictional bar.[9] I am reluctant to infer a congressional intent to raise this standard from the silence of Congress. *Cf. Central Bank v. First Interstate Bank*, —— U.S. ——, ——, 114 S.Ct. 1439, 1453, 128 L.Ed.2d 119 (1994) (noting that arguments from congressional inaction are unpersuasive). Therefore, I conclude that the prior judicial constructions of the necessary quantum of disclosure embodied in *Pettis* and its progeny survive the 1986 amendments. Congress has changed where we are to look for the disclosures; we no longer look at information in the government's possession, rather we look at public disclosures. However, Congress did not change the amount of disclosed information we must find when we look there. The pre–1986 test used to determine how much information triggered the jurisdictional bar remains useful as a test to determine how much public disclosure constitutes a disclosure of "allegations or transactions."

My interpretation of the legislative intent is reinforced by the fact that § 3730(e)(4)(A) is a jurisdictional bar. Federal courts construe statutes conferring (or removing) jurisdiction strictly against a finding of jurisdic-

---

8. The legislative history of the 1943 amendments indicates that at least some members of Congress mistakenly believed that an original source could bring a suit under those amendments. *See* S.Rep. No. 345, 99th Cong., 2d Sess., at 12, *reprinted in* 1986 U.S.C.C.A.N. at 5277. In light of this confusion, the 1986 amendments may easily be viewed as a correction of this misunderstanding.

9. If the text has a plain meaning, it can only be to expand the jurisdictional bar to remove jurisdiction in more cases. However, the text is ambiguous, making reference to extrinsic aids in interpretation, such as the legislative history, appropriate. The legislative history reveals a con-

gressional intent to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government" and to make the FCA "a more useful tool against fraud in modern times." S.Rep. No. 345, 99th Cong., 2d Sess., at 1, *reprinted in* 1986 U.S.C.C.A.N. at 5266. However, this general intent was effected by the numerous other amendments to the *qui tam* provisions, scienter requirement, and relator compensation schemes. Thus, there is no reason to infer a clear statement of a specific intent to reverse the *Pettis* line of cases from this general intent that was effected through numerous other changes to pre-existing law.

tion. *Precision Co.*, 971 F.2d at 552. Thus, I conclude (and *Springfield* confirms) that Congress intended "allegations or transactions" to preserve the existing law, so that the jurisdictional bar is implicated whenever the disclosures were " 'sufficient to enable [the government] adequately to investigate the case and to make a decision whether to prosecute.' " *Springfield*, 14 F.3d at 654 (quoting *Pettis*, 577 F.2d at 674). This standard is quite different from the vastly more restrictive standard adopted by the majority without any reference to the history of the amendments, the intent of Congress, or the prior law.

### B. Decision of the D.C. Circuit in *Springfield*

The majority relies heavily upon *Springfield* to support its conclusion that "the essential elements exposing the transaction as fraudulent must be publicly disclosed as well [as the subject transactions]."[10] Maj. op. at 1512. The majority's analysis of *Springfield* that it uses to support this holding seriously misapplies and misinterprets *Springfield*. First, assuming that the majority's interpretation of *Springfield* is correct, the facts in this case differ significantly from those in *Springfield*. The majority's failure to recognize these differences results in a misapplication of *Springfield*. Second, the majority focuses too narrowly upon a hypothetical posed in the *Springfield* opinion, and thus misinterprets *Springfield*. *Springfield* involved a disclosure of only one of three elements of a fraudulent transaction. The portions of *Springfield* stating that all elements of a fraudulent transaction must be disclosed for there to be a disclosure of "allegations or transactions" must be read in light of the "notice standard" adopted by *Springfield* because these statements erroneously assume

that a fraudulent transaction consists of only two elements.

### 1. The majority ignores significant factual differences between this appeal and *Springfield*.

The majority cites *Springfield* as standing for the proposition that § 3730(e)(4)(A) bars suit only when " 'the critical elements of the fraudulent transaction themselves [are] in the public domain.' " Maj. op. at 1512 (quoting *Springfield*, 14 F.3d at 654). Because it is so central to my disagreement with the majority, a more complete quotation is necessary to reveal the context out of which the majority has taken this conclusion:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

*Springfield*, 14 F.3d at 654.

Assuming arguendo that the X + Y = Z equation accurately states the requisite elements of an FCA action, the majority misapplies this formula. Although the majority never expressly so states, it apparently assumes that only the represented state of affairs (X) was publicly disclosed prior to Rabushka's suit. The newspaper articles listed by the majority clearly disclose Crane's computations of CF & I's pension liability that are the allegedly false representations, and the corporate documents containing such

---

**10.** The majority opinion also relies upon *Wang*, 975 F.2d at 1412. However, in *Wang*, the disclosures found not to be public consisted of an internal memo between two engineers for a government contractor that was disclosed during discovery in the *qui tam* action. *Id.* at 1416. The *Wang* court's conclusion that no allegations

or transactions were publicly disclosed was based upon a consideration of the nature of the disclosure, not the type of information contained in that disclosure. Thus, *Wang* is inapposite here, where there is a concededly public disclosure of information, and the nature of this disclosed information is at issue.

figures are on file with the SEC.[11] The majority appears to hold that there was no public disclosure of the true facts (Y) (*i.e.,* there was no disclosure of the falsity of Crane's representations) prior to Rabushka's suit. *See* Maj. op. at 1513 ("the available information cited by Crane reports seemingly legitimate transactions"). Therefore, because only one (X) of the two elements comprising the transaction (X and Y) was publicly disclosed, the majority concludes that there was no public disclosure of "allegations or transactions" as required by § 3730(e)(4)(A) in order for the jurisdictional bar to apply. The majority errs in this conclusion.

The allegedly true facts must be determined by reference to Rabushka's complaint. In his complaint, Rabushka alleges that Crane and unidentified coconspirators conspired to evade responsibility for CF & I's unfunded pension liability by simultaneously spinning CF & I off and concealing material facts from the SEC and PBGC. Rabushka characterizes the concealed facts as Crane's and CF & I's respective "interest[s] in, liability for, and intentions with regard to unfunded pension liabilities under [CF & I's] pension plans." *See* App. at 7. Thus, according to Rabushka, the true facts are that CF & I was financially doomed at the time of the spin-off due to the size of the pension obligation, that CF & I was spun off by Crane solely for the purpose of avoiding liability for CF & I's unfunded pension liability, and that the true extent of CF & I's unfunded pension obligations was intentionally understated to facilitate the spin-off. The conversations reported in Rabushka's affidavits parallel these allegations, and are primarily intended to provide evidence of Crane's deliberate understatement of CF & I's unfunded pension obligations.

The true facts alleged by Rabushka have been repeatedly publicly disclosed. Crane's intentions regarding CF & I's unfunded pension liability were fully disclosed by Benja-

min R. Jacobson, Robert S. Evans, Robert Joseph Slater, Dwight Church Minton and Thomas M. Evans when they testified before the SEC. Jacobson testified that the Crane board of directors sought to avoid liability for CF & I's unfunded pension obligations. T.M. Evans and Minton testified that unless CF & I could survive for a period of time on its own, Crane would be liable for CF & I's unfunded pension obligations. R.S. Evans testified that CF & I's bankruptcy was a major concern for Crane because of CF & I's cash flow problems and lack of long-term financing. Slater testified that he (and others) expected CF & I to go bankrupt if it did not obtain long-term financing. T.M. Evans confirmed that CF & I never had long-term financing and was unable to obtain such financing. T.M. Evans summed it up nicely when he told the SEC, "if [Crane] got rid of [CF & I], [Crane] wouldn't be li[able] if [CF & I] stayed [viable] a certain time." T.M. Evans concluded that given CF & I's financial condition, "[i]t was certainly to Crane's advantage to spin [CF & I] off promptly." In light of this and volumes of similar testimony before the SEC, I would find that Crane's intentions regarding CF & I and its unfunded pension obligations were publicly disclosed.

Crane's interest in and liability for CF & I's unfunded pension obligations were also repeatedly disclosed. Again, T.M. Evans and Minton made it clear that unless CF & I "stood on its own" for a period of time, Crane would be liable for CF & I's unfunded pension obligations. Jacobson reiterated this testimony. Crane's potential liability for CF & I's unfunded pension obligations was hardly a secret. Numerous newspaper articles chronicled the ballooning figures, and as early as May 19, 1985, *The Pueblo Star–Journal and Sunday Chieftain* noted that after the spin-off, "[CF & I's] pension liability … will no longer be the responsibility of the much larger Crane Co." Significantly, the first non-CF & I figures (provided by the PBGC)

---

11. *Springfield* itself notes that the represented state of affairs will generally be publicly dis-

closed. 14 F.3d at 656.

were substantially higher than the figures provided earlier by CF & I and Crane. Against this backdrop of rapidly expanding pension liability and corporate desperation, Cummings made his colorful statement that Crane's actuary had "miscalculated" the amount of the pension obligation.[12] Moreover, R.S. Evans referred to CF & I as "a bankrupt company" in 1985 when CF & I was represented to have $82 million in shareholder equity. Apparently, R.S. Evans' assessment of CF & I's liabilities did not suffer from the "miscalculations" that infected the assessment presented in CF & I's corporate reports. After these repeated public disclosures of Crane's interest in and potential liability for CF & I's unfunded pension obligations, and the burgeoning pension shortfall, it should come as no surprise that the PBGC began an investigation. I would hold that Crane's and CF & I's respective interests in and liability for the unfunded pension obligations were publicly disclosed.

Thus, assuming the majority is correct in its interpretation of *Springfield*, it has misapplied that case to these facts. The majority simply isolates each newspaper article and notes what each article in isolation "does not indicate." The majority fails to consider the news articles in the aggregate, ignores the SEC hearings completely, and refuses to consider Cummings' statement as anything other than a (non) allegation of fraud. When the facts are properly viewed, public disclosures abound. The newspaper articles based on CF & I's reports and representations and the CF & I corporate reports (to the extent they were filed with the SEC) contain numerous public disclosures of the purportedly false representations (X). The testimony before the SEC, when coupled with Cummings'

statement and the reports of CF & I's burgeoning unfunded pension obligations, suffice as public disclosures of the true facts (Y). The disclosure of both of these elements together should (and did) permit intrepid government investigators, "through the exercise of diligence typical of law enforcement authorities," to discover or deduce the existence of fraud (Z). *United States v. DiSantillo*, 615 F.2d 128, 135 (3d Cir.1980). I would hold that these numerous public disclosures were sufficient to qualify as a "public disclosure of allegations or transactions." Accordingly, I would hold Rabushka's *qui tam* action barred under § 3730(e)(4)(A), and would affirm the district court on this issue.

The majority's misapplication of *Springfield* is confirmed by a comparison of the facts involved in the instant appeal with those of *Springfield*. As the majority notes, *Springfield* involved the public disclosure of the pay vouchers and telephone records maintained by an arbitrator and obtained through discovery in related litigation. These records revealed that the arbitrator made certain claims for compensation (the false set of facts, or X). Through independent investigation, Springfield determined that some of the submitted claims for compensation were the result of the arbitrator's "fraudulent behavior" (*i.e.*, were false, or Y) and brought a *qui tam* action based upon the information disclosed by this investigation. 14 F.3d at 648. The *Springfield* court makes no mention of any governmental investigation. In contrast, Rabushka makes his claims based upon newspaper articles, corporate reports and disclosures to the SEC and bankruptcy court. There is no information provided by any independent investigation by Rabushka. Indeed, there is no indication

---

12. The majority attributes great significance to the fact that Cummings' statement contained several possible innocent explanations for these "miscalculations." Maj. op. at 1512. However, if the miscalculations were truly innocent, it is doubtful that Cummings, who was acting in his role as lawyer for CF & I, would feel obligated to qualify his statement with the observation that such a label was "putting the kindest possible face" on the errors. Moreover, if the miscalculations were merely mistakes, it is unlikely that

Cummings would consider "miscalculations" to be a "pejorative term." Although I do not agree with the majority that Cummings' statement was "insufficient to rise to the level of a public allegation of fraud on the part of Crane," I will assume, arguendo, that his statement was not such an allegation and will consider it only as a disclosure of certain elements of the transactions at issue. The majority completely fails to consider this possibility.

that Rabushka has even conducted any such investigation. However, the PBGC has initiated an investigation. In sum, the public disclosures in *Springfield* consisted of only one element of a fraudulent transaction, and Springfield supplied the other elements through independent investigation while the government stood idly by. The public disclosures in Rabushka's appeal consist of two elements of fraud, and were sufficient to alert the PBGC to the need for an investigation, while Rabushka contributed nothing.[13]

## 2. The majority focuses too narrowly upon dictum in *Springfield*.

Although the *Springfield* court's conclusion is a correct analysis of the hypothetical posed, the hypothetical is premised upon the assumption that an FCA action requires allegations (and proof) of only two elements, when in fact such an action requires proof of at least three[14] elements: (1) a represented set of facts; (2) a true set of facts that differs from the represented facts (*i.e.,* falsity of the representations); and (3) scienter.[15] Although not considered by the *Springfield* court, scienter is a required element of an FCA violation. *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991) (noting requirement of knowledge in § 3729(a)(1), (a)(2) & (a)(7)); *see* 31 U.S.C. § 3729(b). When the hypothetical is revised to reflect all the required elements of an FCA violation, it becomes: W (scienter) + X (false representations) + Y (true facts) = Z (fraud). Recognition that the *Springfield* hypothetical omits scienter is

13. *Cooper v. Blue Cross & Blue Shield of Fla.,* 19 F.3d 562 (11th Cir.1994) (per curiam), upon which the majority relies, may be similarly distinguished. In *Cooper,* the relator conducted extensive investigation on his own and goaded the government for action. He filed a *qui tam* action only when the government declined to take any action. This short per curiam opinion is far from rich in facts, but those that are given paint a picture that is completely different from the facts involved in the instant appeal. It is not clear from the *Cooper* opinion whether the false facts (the BCBSF claims to the government) were publicly disclosed. The only clearly discernable disclosure is contained in the GAO report, and it is a disclosure of motive from which scienter may be inferred. If only scienter is disclosed, then *Cooper* is completely consistent with *Springfield.* To the extent that *Cooper* may be inconsistent with *Springfield,* I find the *Cooper* opinion that does "not explain its analysis in detail" to be unpersuasive when compared to the detailed analysis of *Springfield.*

It is notable that the panel majority can identify no case in which a *qui tam* relator was permitted to maintain an action in the face of disclosures even remotely as voluminous as those present here. Indeed, several reported cases invoke the jurisdictional bar when confronted with public disclosures considerably less substantial than those made here. *See, e.g., United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 322–23 (2d Cir.1992) (disclosures by FBI agents during execution of search warrant constituted public disclosure of allegations); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins.,* 944 F.2d 1149, 1157 (3d Cir.1991) (disclosure of single memorandum describing allegedly fraudulent billing practice (but not its false or fraudulent nature) obtained through discovery in unrelated litigation constituted public disclo-

sure of allegations or transactions); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1157–58 (2d Cir.) (discovery materials indicating that engineering change was made to Black Hawk helicopter (*i.e.,* the false state of affairs) constituted public disclosure of allegations or transactions), *cert. denied,* —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); *Cooper,* 19 F.3d at 567 (mention of defendant BCBSF during House-subcommittee hearing on fraud constituted public disclosure of allegations).

14. In order to recover damages, a *qui tam* relator must also prove a fourth element, damages. *See United States v. Lawson,* 522 F.Supp. 746 (D.N.J.1981) (construing 31 U.S.C. § 231, a predecessor to 31 U.S.C. § 3729). Because this element is subsumed by the others (*i.e.,* if the false representations and the true facts are proven, the amount of damages may, at least in theory, be determined), it will not be separately considered.

15. Each of the provisions of § 3729(a) contains a specific scienter requirement. Subsections (1), (2), (6) and (7) require knowledge. Subsections (4) and (5) require a specific intent to defraud. Subsection (3), upon which this action is based, is addressed to conspiracies to defraud. Such a conspiracy requires a purpose to defraud (*i.e.,* specific intent). *Boese, Qui Tam Actions* 2–19; *see In re North Dakota Personal Injury Asbestos Litig. No. 1,* 737 F.Supp. 1087, 1095 (D.N.D. 1990); 16 Am.Jur.2d *Conspiracy* § 49; *cf* 16 Am.Jur.2d *Conspiracy* §§ 13–14 (intent necessary for criminal conspiracy and such intent presupposes knowledge). All of these mental states will be referred to generically as "scienter."

the key to properly interpreting the dictum in *Springfield* and to recognizing the majority's error.

I would hold that the disclosures in the various newspaper articles and before the SEC and the bankruptcy court constituted public disclosures of both the true state of affairs, as demonstrated above, and scienter, as demonstrated below. Accordingly, I would hold that because there has been a public disclosure of all three elements of an FCA violation, the jurisdictional bar of § 3730(e)(4)(A) removes federal court jurisdiction over Rabushka's *qui tam* action. However, even if the majority's conclusion that there was no public disclosure of the true facts is accepted, the disclosures in the various newspaper articles and before the SEC and the bankruptcy court constituted public disclosures of scienter. Thus, even if the majority's position is adopted, there has been a disclosure of the false representations (X) and of scienter (W). I would hold that a disclosure of two of the three elements is sufficient to constitute a public disclosure of "allegations or transactions." Accordingly, I would affirm the district court.

"A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so." *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *other aspects overruled,* 865 F.2d 1370 (1989); *see Patrick Carter Assocs. v. Rent Stabilization Ass'n of N.Y.C.*, 1990 WL 195993 (S.D.N.Y. Nov. 28, 1990); *Wolff Office Equip. Corp. v. Wang Lab.*, 1988 WL 143119 (S.D.N.Y. Dec. 30, 1988); 37 Am.Jur.2d *Fraud* § 19 (although not legally necessary, "it is said to be a significant fact tending to show fraud that a representor profited by his representation" and "the fact that he did derive a benefit may serve to strengthen the [fraud] plaintiff's case on the evidence"). Here, the public disclosures clearly amount to a showing that Crane had a motive to commit fraud, and thus provide sufficient evidence of scienter that (when combined with the public disclosures of the representations and the other "abnormalities" surrounding this case) government investigators should have been (and in fact were) alerted to the need for an investigation.

The transcripts of the SEC hearings fairly exude motive for fraud. Benjamin R. Jacobson testified that "we [Crane] were concerned that the possibilities that CF [ & ] I would go bankrupt, and what claims and liabilities might kick back on the new holders of Crane shares." Dwight Church Minton testified that T.M. Evans thought it desirable to spin CF & I off and that it was questionable "whether CF & I could last any length of time as an independent company, and should it fail to operate as an independent company for some length of time … it could result in liabilities coming back to Crane, which would be an extremely serious matter." T.M. Evans testified that as a result of CF & I's poor financial condition, the effects of a CF & I bankruptcy were of great concern to Crane when it considered whether to spin CF & I off, concluding that "[i]t's obvious, if [CF & I] was a subsidiary to Crane, [Crane] would be li[able]. The only thing is if [Crane] got rid of [CF & I], [Crane] wouldn't be li[able] if [CF & I] stayed a certain time." Thus, "[i]t was certainly to Crane's advantage to spin it off promptly." These and other similar statements clearly indicate that Crane had a motive to conceal facts that would inhibit the spin-off so that the spin-off could be consummated quickly. A quick spin-off was necessary to provide enough time before CF & I's anticipated bankruptcy that Crane would not be liable for CF & I's unfunded pension obligations.

Thus, I conclude that the public disclosures were sufficient to disclose the represented state of affairs (X) and motive and opportunity, from which a strong inference of scienter (W) arises. The combination of these two of the three elements of a fraudulent transaction were sufficient to place the government on notice of the need for an investigation, and were therefore sufficient to constitute "allegations or transactions" under § 3730(e)(4)(A).

This view of the jurisdictional bar is consistent with the facts and rationale of *Springfield*. *Springfield* states:

> Turning then to the case at hand, we conclude that the information disclosed via discovery cannot rise to the level of "allegations or transactions" so as to prevent the exercise of jurisdiction. Fraud requires recognition of two elements: a misrepresented state of facts *and* a true state of facts. *The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud....* Knowledge of the allegedly misrepresented state of affairs—which does not necessarily entail knowledge of the fact of misrepresentation—is *always* in the possession of the government.

14 F.3d at 655–56 (emphasis partially added). *Springfield* thus stands squarely for the proposition that *qui tam* jurisdiction is not defeated by the presence of only one of the elements of an FCA claim. Properly interpreted, it does not stand for the proposition cited by the majority that all three elements of the claim must be disclosed.

The *Springfield* court's holding is based upon the rationale that the jurisdictional bar is designed to prevent *qui tam* actions in cases that the government could pursue. *Qui tam* suits are not necessary where "enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y), or the allegation of fraud (Z). When either of these conditions is satisfied, the government itself presumably can bring an action under the FCA and there is no place in the enforcement scheme for *qui tam* suits." *Id.* at 654. Such suits, if permitted, would "tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue." *Id.* If the fraudulent transaction is viewed as W + X + Y = Z, and disclosure of X + Y was considered sufficient to bar jurisdiction in *Springfield*, I can see no reason why the disclosure of W + X should not be sufficient to bar jurisdiction in this case.

## III. RABUSHKA'S ACTION WAS "BASED UPON" PUBLICLY DISCLOSED ALLEGATIONS OR TRANSACTIONS

Under 31 U.S.C. § 3730(e)(4)(A), a district court is deprived of subject matter jurisdiction over a *qui tam* action only where that action is "based upon the public disclosure of allegations or transactions." The jurisdictional bar applies only if there is a sufficient nexus between the public disclosure of allegations or transactions and the subject matter of the *qui tam* action. The phrase "based upon," which describes this nexus, has been broadly interpreted by other courts of appeals to mean "based in any part upon." *Precision Co.*, 971 F.2d at 552–53; *Kreindler & Kreindler*, 985 F.2d at 1158; *Doe*, 960 F.2d at 324.

Until the decision in *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994), there was virtual unanimity among the courts of appeals in interpreting "based upon" in this manner. *Becton* rejected this analysis, and took pains to distinguish its position from that taken by previous courts. *Becton*, 21 F.3d at 1349. I would reject *Becton* for three reasons. First, I find the analysis used to support its interpretation of "based upon" to be unpersuasive. Second, the *Becton* interpretation of "based upon" conflicts with the structure of the FCA. Third, the *Becton* interpretation conflicts with the history and purpose of the FCA.

*Becton* dismissed prior decisions construing "based upon" to mean "based in any part upon" because "[t]he extent to which a *qui tam* action must be 'based upon' a public disclosure is, of course, distinct from the analytically antecedent question of what it means for an action to be 'based upon' a public disclosure." *Id.* at 1349. Although this distinction is an admirable example of subtle metaphysical analysis, it is simply irrelevant where the issue to be decided is

whether an action that relies [16] in part upon public disclosures is "based upon" the disclosures within the meaning of that phrase as used in the FCA. A court is confronted with an action that relies upon a public disclosure, and must decide whether that action is within the FCA's jurisdictional bar. *Becton*, perhaps correctly, observes that the question of *whether* an action is "based upon" a disclosure is distinct from, and antecedent to, the question of *how much* an action is "based upon" a disclosure. However, the decisional process requires the court to take the facts as given and apply the statutory language to them. Thus, the court is given an action that *ex hypothesi* relies in part upon a public disclosure, and it must decide *whether* that action is "based upon" the disclosure. (The FCA never calls for the court to make the second determination of *how much* the action is "based upon" the disclosure.) *Becton* bolsters this distinction with an appeal to common sense, but I find this appeal unpersuasive in light of the fact that the common sense of all previous courts of appeals has led to an opposite conclusion. *See, e.g., Precision Co.*, 971 F.2d at 552–53; *Kreindler & Kreindler*, 985 F.2d at 1158; *Doe*, 960 F.2d at 324.

Moreover, the statutory scheme of the FCA provides an additional reason to reject *Becton*'s interpretation of "based upon." If the *Becton* interpretation is adopted, the original source provision becomes largely superfluous. Under *Becton*, the jurisdictional bar applies only when the *qui tam* relator has obtained his information solely from the public disclosure. However, if the relator's sole source is the public disclosure, it is impossible for the relator to have independently obtained information, because all the relator's information was obtained solely from the public disclosure. Such an interpretation renders the independent knowledge

provision redundant. Where a statute is subject to a reasonable construction that gives effect to all of its provisions, I would decline to adopt a construction that renders one provision a mere redundancy. *Beef Neb., Inc. v. United States*, 807 F.2d 712, 717 (8th Cir.1987); *Darling v. Bowen*, 878 F.2d 1069, 1076 (8th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1782, 108 L.Ed.2d 783 (1990).

Finally, as discussed above, the purpose of the FCA reinforces the pre-*Becton* interpretation. When the government has all the information necessary to initiate an investigation, and the relator possesses only redundant information, there is simply no need for *qui tam* actions as a means of enforcement. *Becton* would permit a *qui tam* action in a case where the government already possessed all the evidence it required to take a case to trial, provided that the relator's *qui tam* action was not based solely upon the disclosures from which the government derived its evidence. The relator need only supply a trivial bit of new evidence to avoid the jurisdictional bar under *Becton*. Allowance of *qui tam* actions in this context merely frustrates the congressional intent.

For these reasons, I reject *Becton*'s interpretation of "based upon." I would hold that Rabushka's *qui tam* action is "based upon" the publicly disclosed allegations or transactions, and therefore the district court had no jurisdiction over the action unless Rabushka is an original source. Because Rabushka has conceded that he is not an original source,[17] I would affirm the district court.

## IV. DENIAL OF RABUSHKA'S MOTION TO AMEND THE COMPLAINTS WAS NOT AN ABUSE OF DISCRETION

The standard of review for a denial of leave to amend a complaint is whether the

16. It is not unlikely that the *Becton* court was confused by two different uses of the phrase "based upon." To say that an action is "based upon" a public disclosure in a colloquial sense is not to say that it is "based upon" the disclosure as that term is used in the FCA. In order to minimize this confusion, the term "relies upon" will replace the colloquial use of "based upon,"

and "based upon" will be used only as it appears in the FCA.

17. For this reason, I would also deny Rabushka's eleventh-hour motion to amend his complaint to cure the jurisdictional defect.

trial court abused its discretion. *Harbor Ins. Co. v. Essman,* 918 F.2d 734, 739 (8th Cir. 1990). Rabushka's motion for leave to amend was made after the first complaint was dismissed, and the amendment was intended merely to modify the theory of liability, not to change any jurisdictional allegations. App. at 333 (Plaintiff's Motion for Leave to Amend the Complaint). Because Rabushka's complaint had already been dismissed for lack of subject matter jurisdiction, and the proposed amendment did not remedy the jurisdictional deficiency, the denial of leave to amend was not an abuse of discretion. *Harbor Ins. Co.,* 918 F.2d at 739; *Vitale v. Aetna Casualty & Sur. Co.,* 814 F.2d 1242, 1252 (8th Cir.1987); *Niagara of Wis. Paper Co. v. Paper Indus. Union–Management Fund,* 800 F.2d 742, 749 (8th Cir.1986). Accordingly, I would affirm the district court in this regard as well.