UNITED STATES of America, ex. rel. Dr. Man Tai LAM, Dr. William Meshel, Plaintiffs,

v.

TENET HEALTHCARE CORP., Defendant.

No. EP–02–CA–525–KC.

United States District Court, W.D. Texas, El Paso Division.

Aug. 15, 2006.

---

Mitchell L. Weidenbach, Assistant United States Attorney, San Antonio, TX, Antonio V. Silva, Law Offices of Antonio V. Silva, El Paso, TX, Mark Nagle, Troutman and Sanders, LLP, Washington, DC, Phillip Michael, Troutman & Sanders LLP, New York, NY, for Plaintiffs.

Joseph L. Hood, Jr., Scott, Hulse, Marshall, Feuille, Finger & Thurmond, P.C., El Paso, TX, Katherine Lauer, Latham & Watkins, San Diego, CA, for Defendant.

## ORDER

CARDONE, District Judge.

On this day, this Court considered Defendant Tenet Healthcare Corporation's Motion to Dismiss ("Def.'s Motion"). For the reasons set forth herein, Defendant's Motion is **DENIED** in part and **GRANTED** in part.

## I. BACKGROUND

### A. The Outlier System

The Government provided the following summary of the outlier program in its Statement of Interest, which this Court now includes for purposes of placing the instant action in context. However, this Court does not expressly adopt this characterization of the outlier system.

Congress established the Medicare Trust Fund to protect the health of this country's aged and infirm. United States' Statement of Interest 2. In most cases, Medicare reimburses hospitals a fixed amount of money for each patient stay as a result of the Diagnosis Related Group ("DRG") assigned to the patient, based upon his or her diagnosis and the procedures that the hospital has performed. *Id.* Generally, the amount that hospitals receive from the Medicare program for treating patients does not vary with the cost of treating the patient. *Id.*

In certain circumstances, however, the Medicare program supplements DRG payments in light of the hospital's cost of care. *Id.* In order to ensure that hospitals have an incentive to treat patients whose care requires unusually high costs, the Medicare program will use a portion of the Medicare Trust Fund for certain "cost out-

lier" cases. *Id.* at 2–3. Specifically, Congress authorizes the Centers for Medicare and Medicaid Services ("CMS") to make additional payments beyond the usual reimbursement amount ("cost outlier payments") where a hospital's "marginal cost of care" exceeds a particular threshold. *Id.* at 3 (citing 42 U.S.C. § 1395ww(d)(5)(A)(iii)). By statute, Congress directs CMS to identify cost outlier cases by adjusting a hospital's charges for an inpatient stay to reflect that hospital's costs for the stay. *Id.* (citing 42 U.S.C. § 1395ww(d)(5)(A)(ii)).

In compliance with the relevant statute, CMS implemented regulations that provided for outlier payments where a hospital's charges, multiplied by its ratio of costs to charges from its most recently settled cost report, exceeded a certain threshold. *Id.* (citing 42 C.F.R. §§ 412.80, 412.84). Because it takes several years for a hospital's cost report to be settlement, CMS typically multiplied a hospital's current charges by the hospital's cost-to-charge ratio derived from a cost report for a prior year. *Id.* As a result, if a hospital inflated its charges without a corresponding increase in costs, the inflated charge, when multiplied by the hospital's historical cost-to-charge ratios, would lead to artificially high "costs." *Id.* Accordingly, one of the key factors in assessing outlier fraud allegations is a hospital's costs.

## B. The Instant Action

Doctors William Meshel ("Dr.Meshel") and Man Tai Lam ("Dr.Lam") (collectively "Relators") have practiced medicine in El Paso, Texas since 1979 and 1998, respectively.[1] Third Am. Compl. ¶¶ 8–9

("TAC"). Throughout their careers, Drs. Lam and Meshel have either maintained privileges and/or held appointments at numerous El Paso area hospitals, including Providence Memorial Hospital ("Providence") and Sierra Medical Center ("Sierra"). *Id.* ¶¶ 8, 10. In fact, between 1989 and 1992, Dr. Lam served on the Medical Executive Committee of Providence, which is the highest governing body for the medical staff there.[2] *Id.* ¶ 10. Defendant Tenet Healthcare Corporation ("Tenet") operates and maintains both Providence and Sierra. *Id.* ¶ 7.

Dr. Lam alleges that, by virtue of his management positions at Providence and Sierra, he knew that Providence and Sierra were earning substantially higher profits than Southwestern. *Id.* ¶ 11. He alleges that he knew that Tenet hospitals listed much higher charges on their charge master (the hospital's published list of fees for various services) than Southwestern, even though the Government generally reimburses a fixed amount for DRGs irrespective of the figure stated on the charge master. *Id.* Though he had been briefed on the outlier component of the Medicare reimbursement system, he did not immediately recognize how increases in charge master prices affected reimbursement for outliers. *Id.* ¶ 12.

At some point prior to January/February 2002, Dr. Lam met with Dr. Meshel and exchanged information concerning Tenet's practices with respect to medical directorships and high DRG charges. *Id.* ¶ 15. Thereafter, in January/February 2002, Dr. Meshel met with two Federal Bureau of Investigation ("FBI") agents to

---

1. In the context of the False Claims Act, a relator is a private individual who brings suit on behalf of the Government against those who commit fraud against the Government. Claire M. Sylvia, The False Claims Act. Fraud Against the Government § 1:1 (Thompson/West Jan. 2006).

2. Currently, he is a managing partner and Chief of Staff at Southwestern General Hospital ("Southwestern"), a competitor of Tenet. TAC ¶ 9. Dr. Lam has held an ownership interest in Southwestern since December 2002. *Id.* ¶ 8.

discuss his and Dr. Lam's observations of Tenet's charging practices. *Id.* ¶ 14. He again met with FBI agents on April 16, 2002 to discuss Tenet's misuse of medical director fees and overcharges associated with certain DRGs. *Id.* ¶ 16. During this meeting, one FBI agent told Dr. Meshel that "the case might be difficult to prove." *Id.* Though disappointed, Dr. Meshel continued to gather information and meet with FBI agents from April through September of 2002. *Id.* ¶¶ 16–19.

In July 2002, David Buchmueller became Administrator of Southwestern and acknowledged that Providence and Sierra were "Holiday Inns" charging "Four Seasons" prices. *Id.* ¶ 17. He gave Dr. Meshel a book comparing national DRG charges for five common DRGs. *Id.* ¶ 18. The information in this book affirmed Drs. Meshel's and Lam's suspicions that the charges at Providence and Sierra were extraordinarily high. *Id.* ¶ 18. Consequently, Dr. Meshel continued to meet with FBI agents to discuss Tenet's outlier practices. *Id.* ¶ 20.

On November 18, 2002, Drs. Lam and Meshel filed a *qui tam* action on behalf of the United States. *See generally* Compl. for Damages and Inj. Relief Under False Claims Act. In July 2005, the Government formally indicated an intention not to intervene in the suit. Accordingly, Relators pursue this case on their own, alleging two causes of action. First, Relators allege that "Tenet improperly manipulated the [o]utlier system by artificially inflating its charges when its real costs remained constant or even declined," thereby improperly manipulating payments from the Medicare/Medicaid system. *Id.* ¶ 31. Second, Relators allege that Tenet developed a "kickback scheme," whereby it offered remuneration in the form of medical directorships at Tenet and reimbursement of office expenses to physicians who referred patients to Tenet hospitals. *Id.* ¶¶ 34, 46.

## II. DISCUSSION

### A. Standards

■ The False Claims Act, 31 U.S.C. § 3729 *et seq.*, ("FCA") permits private parties to bring certain suits on behalf of the United States against anyone submitting a false claim to the government. *Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173 (5th Cir.2004). However, courts lack jurisdiction to hear these *qui tam* claims unless the private parties bringing them pass the FCA's "public disclosure bar," set forth in 31 U.S.C. § 3730(e)(4)(A). *Id.; see also Qui tam Action*, BLACK'S LAW DICTIONARY (8th ed.2004), *available at* http://www.westlaw. com ("An action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.") Specifically, the public disclosure bar provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

A challenge under the public disclosure bar is treated as a motion for summary judgment because it is intertwined with the merits of the case. *Reagan*, 384 F.3d at 173; *Laird v. Lockheed Martin Eng'g and Sci. Serv. Co.*, 336 F.3d 346, 350 (5th Cir.2003). Summary judgment is proper if, viewing the evidence and inferences drawn from the evidence in a light most favorable to the non-moving party, there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Reagan*, 384 F.3d at 173. A court may not weigh the evidence or evaluate the credibility of witnesses at this stage. *Reagan*, 384 F.3d at 173. Rather, all inferences should be made in favor of the non-moving party. *Id.*

■ In addition, Federal Rule of Civil Procedure 9(b) requires that claims brought under the FCA must be pled with particularity. FED.R.CIV.P. 9(b); *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 328 (5th Cir.2003) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1998)). At a minimum, Rule 9(b) "requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud.'" *Dow Chem. Co.*, 343 F.3d at 328. As such, motions to dismiss brought under Rule 9(b) are treated as motions to dismiss brought under Rule 12(b)(6). *Id.*

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. FED.R.CIV.P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true, and view them in a light most favorable to the plaintiff. *Id.; Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir.2002). A court will dismiss a complaint pursuant to Rule 12(b)(6) only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *S. Christian Leadership Conference v. Supreme Court of the State of Louisiana*, 252 F.3d 781, 786 (5th Cir.2001).

### B. Request for Judicial Notice

Initially, Tenet requests that this Court take judicial notice of Exhibits 1 through 12, filed concurrently with its Motion to Dismiss. Def. Tenet Healthcare Corp.'s Req. for Judicial Notice in Support of its Mot. to Dismiss 1 ("Req."). Specifically, Tenet requests this Court to:

(1) take judicial notice of the publication of the Kenneth Weakley Report ("Weakley Report") dated October 28, 2002;

(2) take judicial notice of the publication of nine news articles, labeled Exhibits 2 through 10, including the following: Don Lee, *Tenet Shares Tumble 14% After Downgrade*, L.A. TIMES, Oct. 29, 2002, at 3:1 (Ex. 2); *Tenet Healthcare Shares Fall After Rating is Cut*, N.Y. TIMES, Oct. 29, 2002, at C4 (Ex. 3); Rhonda L. Rundle & Anna Wilde Mathews, *Tenet Reaped Outsize Gains from Flaw in Medicare System*, WALL ST. J., Nov. 11, 2002, at A1 (Ex. 4); Melissa Davis, *Insider Sales Cloud the Tenet Tale*, THESTREET.COM, Nov. 14, 2002, at Stock News (Ex. 5); Reed Abelson, *Tenet Faces Agency Audit of Payments for Medicare*, N.Y. TIMES, Nov. 7, 2002, at C18 (Ex. 7); Karl Stark and Josh Goldstein, *Tenet's Lucrative Billing Seen at 3 Hospitals*, PHILA. INQUIRER, Nov. 9, 2002, at C01 (Ex. 8); Roger Yu, *Triad Falls on Tenet Trouble*, DALLAS MORNING NEWS, Nov. 9, 2002, at 1F (Ex. 9); and Reed Abelson, *Tenet Says It Will Review Price Strategy*, N.Y. TIMES, Nov. 8, 2002, at C1 (Ex. 10); and

(3) take judicial notice of the filing of two court records, specifically the complaint filed on November 1, 2002 and in *Taub v. Tenet Healthcare Corp.*, No. 02–CV–8754 (S.D.N.Y.) and the second amended complaint filed on January 15, 2004 in *In re Tenet Healthcare Corp. Securities*

*Litigation,* Master File No. CV 02–8462 RSWL(RZx) (C.D.Cal.).

Req. 2.

Relators have filed no response to Tenet's request.

■■■ Federal Rule of Evidence 201(b) allows this Court to take judicial notice of facts that are not subject to reasonable dispute in that they are either (1) generally known within the territorial jurisdiction or (2) capable of accurate determination by resort to sources whose accuracy cannot reasonably be questioned. FED.R.EVID. 201(b); *Taylor v. Charter Med. Corp.,* 162 F.3d 827, 831 (5th Cir.1998). Pursuant to Rule 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles. *See, e.g., Washington Post v. Robinson,* 935 F.2d 282, 291 (D.C.Cir.1991) (allowing judicial notice of the existence of newspaper articles); *Jackson v. Godwin,* 400 F.2d 529, 536 (5th Cir.1968) (finding that newspapers and magazines allowed in a prison carried extensive coverage of riots to the point where the district court could take judicial notice of such coverage). Courts also have the power to take judicial notice of Securities and Exchange Commission ("SEC") filings "for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents," prevailing interest rates, the fact that the market is aware of information contained in news articles, and documents filed in other courts to establish the fact of litigation and related filings. *Heliotrope Gen., Inc. v. Ford Motor Co.,* 189 F.3d 971, 981 n. 18 (9th Cir.1999) (market awareness of articles); *Taylor,* 162 F.3d at 830 (court filings); *Lovelace v. Software Spectrum,* 78 F.3d 1015, 1018 (5th Cir.1996) (SEC filings); *Transorient Navigators Co., S.A. v. M/S Southwind,* 788 F.2d 288, 293 (5th Cir.1986) (prevailing interest rates).

■■■ In the instant case, Tenet first asks this Court to take judicial notice of the Weakley Report, which is an article published by UBS Warburg's Global Equity Research. Req. 1. UBS is a financial firm involved in investment banking and general wealth management. *Who We Are,* UBS, http://www.ubs.com (last visited July 21, 2006). Through its analysts, like Kenneth Weakley, it provides customers with economic forecasts, investment strategy, and recommendations. *Id.* In light of these facts, this Court finds that the Weakley Report is analogous to both a newspaper article and a magazine article. It is like a newspaper article in that it reports on news-worthy aspects of investment. It is like a magazine article in that UBS publishes these type of reports on a semi-regular basis to its customers. Accordingly, like a newspaper and magazine article, its existence and coverage are both generally known and capable of accurate determination by resort to sources whose accuracy cannot reasonably be questioned. Therefore, this Court takes judicial notice of the publication of the Weakley Report.

Tenet next asks this Court to take judicial notice of several newspaper articles that discuss the state of Tenet stock in the aftermath of the Weakley Report. Req.1–2. As stated above, this Court may take judicial notice of the coverage and existence of newspaper articles. *Robinson,* 935 F.2d at 291; *Jackson,* 400 F.2d at 536. Accordingly, this Court takes judicial notice of the publication of the articles listed above as Exhibits 2 through 10.

■■■ Finally, Tenet asks this Court to take judicial notice of the filing of two complaints. Req. 2–3. It is clear that courts may take judicial notice of court filings to establish the fact of litigation and related filings. *Heliotrope Gen., Inc.,* 189 F.3d at 981 n. 18. Accordingly, this Court

takes judicial notice of the filing of the two complaints labeled Exhibits 11 and 12.

## C. Relators' Outlier Claim

■ Pursuant to the public disclosure bar, a court must consider the following three issues in determining whether private parties may proceed with their *qui tam* actions: (1) whether there has been "public disclosure" of the allegations or transactions, (2) whether the *qui tam* action is "based upon" the publicly disclosed allegations, and (3) if it is, whether the relators are the "original source" of the information. *Reagan*, 384 F.3d at 173; *Laird*, 336 F.3d at 352. The purpose of this analysis is to further the primary goals of the FCA, namely: (1) to promote private citizen involvement in exposing fraud against the government, and (2) to prevent parasitic suits by opportunistic late-comers who do not contribute to the exposure of fraud. *Reagan*, 384 F.3d at 174.

### 1. Public disclosure

Tenet argues that the allegations and transactions underlying Relators' complaint were publicly disclosed well before the filing of the instant lawsuit on November 18, 2002. To support this argument, Tenet points to the Weakley Report, news articles, and complaints of which this Court has taken judicial notice. Def.'s Mot. 5–8. While Plaintiffs "do not concede" that there was public disclosure of the outlier fraud claim prior to the filing of the instant complaint, they fail to provide any substantive argument as to why the documents contained in Exhibits 1 through 12 should not constitute public disclosure—either in their Opposition to the Tenet's Motion or in their Response to the United States' Statement of Interest. Relator's Opp'n 2.

■ The public disclosure bar applies in cases where allegations have been disclosed in criminal, civil, or administrative hearings, in congressional, administrative, or government accounting office reports, in hearing audits, in investigations, or in the media. *Reagan*, 384 F.3d at 173. The touchstone of public disclosure is potential accessibility by those who are not a party to the fraud. *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2d Cir.1992). It is not necessary that one possess a legal right to pry information concerning fraud from the mouths of innocent employees in order for it to constitute public information. *Id.* at 324. Neither is it necessary that allegations of fraud be widespread before they are deemed publicly disclosed. *Id.* at 323. Generally, all that is required is that there be enough information in the public domain to expose the fraudulent transactions or allegations. *United States ex rel. Findley v. FPC–Boron Employees' Club*, 105 F.3d 675, 686 (D.C.Cir.1997). *Cf. United States ex rel. Siller v. Becton Dickinson & Co. by & Through its Microbiology Sys. Div.*, 21 F.3d 1339, 1348 (4th Cir.1994) (holding that "based upon" standard bars only suits in which the information was derived solely from public disclosures).

■ In the instant case, the Weakley Report, published on October 28, 2002, questioned Tenet's increase in outlier payments and speculated that one explanation could include Tenet's increase in gross charges at a rate significantly greater than net charges over a short period of time. Req. Ex. 1 at 4. A newspaper article from the Los Angeles Times published on October 29, 2002 indicated that shareholders were becoming anxious because the Weakley Report seemed to raise an issue with respect to over-billing and hence possible fraud. Req. Ex. 2. A newspaper article from the Wall Street Journal published on November 11, 2002 noted the sharp decline in Tenet's stock prices since the release of

the Weakley Report, Tenet's new policy of raising charge master prices which are critical to calculating outlier payments, and the fact that many auditors were beginning to question whether the increased outlier payments to Tenet were proper. Req. Ex. 4. Finally, a complaint filed on November 1, 2002 in the Southern District of New York against Tenet Healthcare alleged Medicare fraud, and was later consolidated with other cases filed after that date alleging Medicare fraud specifically in the form of outlier payments. Req. Exs. 11, 12.

In sum, all of this information published in the media and civil complaints is similar to the allegations and transactions contained in Relators' complaint. Relators allege that they knew that Tenet was charging higher charges on their charge master than other local hospitals. TAC ¶ 11. This is information that could have been gleaned from Exhibits 2, 4, and 11, just to name a few. What is more, this information is not only objectively sufficient to raise an inference of fraud, but it did in fact raise such an inference as can be seen from the articles following the Weakley Report. *See, e.g., United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1512 (8th Cir.1994) (holding that newspapers and other reports can constitute public disclosure as long as they are sufficient to raise an inference of fraud). Accordingly, because the information contained in Relators' allegations was potentially accessible by those not a party to the fraud, this Court finds that the information was publicly disclosed prior to November 18, 2002 when Relators filed their complaint. *See* 31 U.S.C. § 3730(e)(4)(A) (depriving courts of jurisdiction over *qui tam* suits if the information underlying the allegations are publicly disclosed in the media or in civil hearings); *John Doe Corp.,* 960 F.2d at 324 (holding that potential accessibility by those not a party to the fraud is the touchstone of public disclosure); *see*

*also United States ex rel. Gilligan v. Medtronic, Inc.,* 403 F.3d 386, 390 (6th Cir. 2005) (finding public disclosure where relevant information is found in journal articles and congressional reports); *Minn. Ass'n of Nurse Anesthetists v. Allina Health System Corp.,* 276 F.3d 1032, 1043 (8th Cir.2002) (finding that public disclosure can result from publication in articles); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1155–1156 (3d Cir.1991) (holding that section 3730(e)(4) was designed to preclude *qui tam* suits based upon information that would have been available to strangers and that information gleaned in litigation qualifies as such).

## 2. Based upon publicly disclosed information

Tenet next argues that this Court lacks jurisdiction over Relators' claims because Relators' allegations are based upon the publicly disclosed information. Specifically, Tenet argues that the public disclosures raised "the specter" of foul play regarding Tenet's receipt of outlier payments to an extent sufficient to put the federal government on notice of the alleged fraud before Relators filed their complaint. Def.'s Mot. 9. Though the public disclosures did not specifically name the two hospitals at issue in Relators' complaint, Tenet argues that Relators' allegations against Tenet merely echo those already in the public domain. Def.'s Mot. 10. Again, while not conceding that their allegations are based upon the public disclosures, Relators fail to address this argument. Relators' Opp'n 2.

 Though this Court has determined that the information contained in Relators' complaint was publicly disclosed, this Court lacks jurisdiction only if the allegations in the complaint were "based upon" the public disclosures. *Reagan,* 384

F.3d at 173; *Laird,* 336 F.3d at 352. A *qui tam* action is based upon public disclosures if it repeats what the public already knows, regardless of whether or not Relators learned about the fraud independent of the public disclosures. *Findley,* 105 F.3d at 683. In other words, a *qui tam* action is based upon public disclosures if the allegations in the complaint are the same as or substantially similar to those that have been disclosed prior to the filing of the *qui tam* suit. *Id.*3d at 687–88 (holding that a court has no jurisdiction when a complaint "merely echoes publicly disclosed, allegedly fraudulent transactions that already enable the government to adequately investigate the case and to make a decision whether to prosecute"); *see Laird,* 336 F.3d at 352; *John Doe Corp.,* 960 F.2d at 324 ("Public disclosure of the allegations divests district courts of jurisdiction over *qui tam* suits, regardless of where the relator obtained his information."). It is not necessary that the public disclosures name the specific defendants at issue in the *qui tam* complaint. *Findley,* 105 F.3d at 687 (finding a complaint based upon public disclosures when it substantially repeated what the public already knew and only added the identity of particular defendants). Finally, if a *qui tam* action is even partially based upon public allegations or transactions, it meets the based upon standard. *Reagan,* 384 F.3d at 173.

As discussed in section II.B.1 above, the allegations in Relators' complaint contain substantially the same information as that which was disclosed prior to filing the *qui tam* action. Publicly disclosed newspaper articles and court documents contained enough information to raise at least an inference of outlier fraud, as evidenced by the newspaper articles following the Weakley Report. *See* Req. Exs. 1–12. Moreover, the Government allegedly began investigating Tenet's potential outlier abuse during the summer of 2002–well before the filing of this *qui tam* action-meaning that it was already "on the trail" of possible fraud.[3] United States' Statement of Interest 3–4. The Government asserts that it was already alerted to the fraud at issue through the press release issued by Tenet on November 6, 2002 and the public conference call held by Tenet on November 7, 2002. *Id.* at 3–4.

In sum, Relators' alleged that Providence and Sierra were earning substantially higher profits than Southwestern and that Tenet listed higher charges on its charge master. These allegations are substantially similar to public disclosures wherein Tenet admitted that it had been aggressive in its pricing and that aggressive pricing had resulted in unusually high outlier payments to certain Tenet hospitals. *Compare* TAC at ¶ 11, *with* United States' Statement of Interest, Ex. 2 (referring to *Tenet Healthcare Conference Call to Discuss Outliers—Final,* FD Wire, 2002 WL 100547457, at *1–3, 6 (issued Nov. 7, 2002)). Therefore, this Court finds that Relators' allegations are based upon public disclosures, and thus Relators are barred from bringing suit unless they are the "original sources" of the information.

### 3. Original source

In cases wherein there has been public disclosure of the information underlying the complaint and the *qui tam* action is based upon those disclosures, courts do not have jurisdiction unless the relators are the "original sources" of the information.

---

**3.** Additionally, the Government alleges that the information Relators provided to the FBI during their meetings had nothing to do with the investigation of Tenet concerning outlier payments, but rather concerned several unrelated *qui tam* suits filed by Dr. Meshel. *Id.* at 3–4, 7.

*Reagan,* 384 F.3d at 176–77. Section 3730(e)(4)(A) defines "original source" as:

An individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

*Laird,* 336 F.3d at 352 (quoting 31 U.S.C. § 3730(e)(4)(A)).

■■■■ To be an "original source" within the meaning of this statute, Relators must demonstrate both that: (1) they have "direct and independent knowledge of the information on which the allegations are based," and (2) they have voluntarily provided the information to the Government before filing their *qui tam* action. *Reagan,* 384 F.3d at 177. Relators need not be the sole original source of the information, but must merely be "an" original source of the information. *Laird,* 336 F.3d at 355. Moreover, within this standard, Relators are not required to have direct and independent knowledge of each false claim in the complaint. *Reagan,* 384 F.3d at 177. Rather, Relators are required to possess direct and independent knowledge of the information on which the publicly disclosed allegations are based. *Id.*

**a. Direct and independent knowledge**

Tenet, supported by the Government, argues that Relators complaint contains no allegations suggesting that Relators had direct or independent knowledge that Tenet improperly manipulated the outlier system or submitted false claims to the Government. Def.'s Mot. 12. In essence, Tenet argues that Relators make two basic allegations: 1) that certain DRG charges were higher for Sierra and Providence than other El Paso hospitals and 2) that their existing knowledge of the Medicare reimbursement process enabled them to determine that the DRG charges were de-signed to enhance outlier payments. Def.'s Mot. 12–13. Neither of these allegations, according to Tenet, can constitute direct or independent knowledge of the fraud. *Id.*

Relators counter that Dr. Lam, by virtue of his management position, and Dr. Meshel had direct and independent knowledge that Tenet facilities were earning substantially higher profits than their non-Tenet counterparts. Relators' Opp'n 4–5. Each obtained this information well before the publication of the Weakley Report and as a result of their own investigative efforts. Relators' Opp'n 4–5. Relators argue that these two facts, when combined, suffice to make them original sources of the information. *Id.*

■■■■ The Fifth Circuit has defined "direct knowledge" as knowledge that was derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand. *Reagan,* 384 F.3d at 177; *Findley,* 105 F.3d at 690 (finding direct information means first-hand knowledge). When examining whether or not someone had direct knowledge, the court must strike a balance between those individuals who simply stumble upon lucrative knowledge and those who actually exert some effort to unearth important information about false claims. *Reagan,* 384 F.3d at 177; *Laird,* 336 F.3d at 356. Courts look to whether the relator's investigation or experience translates into some additional compelling fact, or demonstrates a new and undisclosed relationship between disclosed facts that puts the Government agency "on the trail" of the fraud where that fraud might otherwise go unnoticed. *Reagan,* 384 F.3d at 179; *United States ex rel. Farmer v. Houston,* No. H–03–3713, 2005 WL 1155111, *5, 2005 U.S. Dist. LEXIS 18387, at *14 (S.D.Tex. May 5, 2005); *United States ex rel. Heath v. Dallas/Fort Worth*

*Int'l Airport Bd.,* No. 3:99–CV–100–M, 2004 WL 1197483, *4, 2004 U.S. Dist. LEXIS 11301, at *11 (N.D.Tex. May 28, 2004). Furthermore, although some circuits have held that relators may meet the direct and independent knowledge requirement by contributing their own investigative efforts to develop fraud allegations, these cases do not stand for the proposition that second-hand information can be converted into direct and independent knowledge simply because the relators discovered what the public already knew. *Reagan,* 384 F.3d at 179.

"Independent knowledge" refers to knowledge that is not dependent upon public disclosure. *Findley,* 105 F.3d at 683, 690. When knowledge has been publicly disclosed, it cannot be said to be "independent" for purposes of the public disclosure bar. *Reagan,* 384 F.3d at 178.

■ In the case at hand, the record reveals that beginning on October 28, 2002 with the Weakley Report, the public domain contained the following information: 1) that outlier payments to Tenet's facilities were substantially higher than those for other hospitals, 2) that Tenet had a new policy of raising charge master prices which are critical to calculating outlier payments, and 3) that lawsuits had been filed against Tenet alleging fraud. Moreover, Tenet had publicly disclosed that it had been aggressive in its pricing and that this had resulted in unusually high outlier payments to certain Tenet hospitals in early November 2002. However, viewing the evidence in a light most favorable to Relators' and drawing all inferences in favor of Relators, an issue of fact nonetheless remains as to whether or not Relators' had direct and independent knowledge.

Relators' allege that they met with FBI agents as early as January/February 2002 to discuss both the payment of kickbacks under the guise of medical director fees and evidence of high charges for certain

DRGs, which high charges would effect outlier payments. TAC ¶ 14. They further allege that they continued to provide the FBI with information relating to outlier fraud through September 2002. *Id.* ¶ 16. If these allegations are taken as true, then it can be inferred that Relators derived this information from their own efforts, rather than through second-hand information already available in the public domain, because until October 28, 2002, there was no such information in the public domain. *See Reagan,* 384 F.3d at 177 (defining direct knowledge as that derived from the source through the relator's own efforts rather than that learned second-hand). The only method by which Drs. Meshel and Lam could have obtained this information would have been through their work at Sierra and Providence.

This conclusion is further supported by the fact that the Government, in its Statement of Interest, asserts that it began its investigation of Tenet's potential outlier abuse during the summer of 2002. United States' Statement of Interest 3. Even assuming that the Government did indeed begin its investigation at this time, Relators' initial contact with FBI agents occurred in January/February 2002. This is well before the Government's alleged investigation began, making it entirely plausible that Relators' could have provided compelling facts or demonstrated a new and undisclosed relationship between disclosed facts that put the FBI "on the trail" of the fraud. *Reagan,* 384 F.3d at 179.

Finally, as mentioned above, since the initial public disclosures referred to by both Tenet and the Government did not occur until after Relators' allege that they undertook the investigation and presented their information to the FBI agents, the information was independent. *Findley,* 105 F.3d at 683. Accordingly, this Court finds that, viewing the evidence in a light most favorable to Relators, Relators had

direct and independent knowledge of the information on which the allegations are based.

### b. Voluntarily provided the information to the Government

In order to pass the public disclosure bar, Relators' must also show that they voluntarily provided the information to the Government before filing their *qui tam* action.[4] *Reagan*, 384 F.3d at 177. Tenet argues that Relators did not voluntarily provide the relevant information to the Government because Relators' allegations lack any information regarding the essential elements of the alleged outlier fraud. Def.'s Mot. 15. Tenet further explains that Relators merely allege that they provided FBI agents with evidence of high DRG charges and Tenet's charging practices, which are insufficient to meet the standard. *Id.* The Government takes the position that "there is a dispute of fact as to whether the [R]elators disclosed anything about outlier fraud to the FBI prior to the public disclosures." United States' Reply to Relators' Resp. to Statement of Interest ¶ 5. Relators argue that they clearly allege that they provided information to the Government prior to the public disclosure of October 28, 2002. Relators' Opp'n 9.

"A person who provide[s] information to the Government that subsequently was uncovered by a reporter and printed in the newspaper, would still be able to maintain a *qui tam* action." *Findley*, 105 F.3d at 690. In essence, accepting all facts and allegations contained in the complaint as true, that is what appears to have happened in this case. *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir.2003). Relators met with FBI agents continuously from January/February of 2002 through September of 2002—well before the date of public disclosure—and provided FBI agents with information regarding Tenet's charging practices. Relators' Opp'n 9. Even if Drs. Meshel and Lam did not provide information specifically relating to Tenet's outlier practices until September 2002, after the date of public disclosure, it is possible that Relators' earlier disclosures regarding DRG charges could have been sufficient to put the Government on the trail of outlier fraud, since high DRG charges factor into outlier payments. Therefore, this Court agrees with the Government that there is at least a dispute of fact as to whether Relators disclosed anything about outlier fraud to the FBI prior to the public disclosures. Accordingly, the Court must deny Tenet's Motion to Dismiss Relators' outlier claims.[5]

4. Tenet also argues that Relators cannot demonstrate that they played a part in publicly disclosing the allegations and information on which their suits were based, citing a Ninth Circuit and a Second Circuit opinion. Def.'s Mot. 15. The Fifth Circuit has never adopted this as a requirement in order to bring *qui tam* actions. *See Reagan*, 384 F.3d at 177 (requiring only two elements to qualify as an original source—that (1) the relator demonstrate direct and independent knowledge, and (2) the relator demonstrate that he voluntarily provided the information to the Government before filing his *qui tam* action). Accordingly, this Court need not address whether Relators played a part in publicly disclosing the allegations and information on which their suits were based.

5. This Court is aware that the Government recently entered into a settlement with Tenet resolving a wide range of issues, including allegations that Tenet's claims for outlier payments violated the FCA. United States' Notice of Settlement of Claims Against Tenet Healthcare Corp. However, such settlement does not bar Relators from pursuing the instant action, as they may still claim a percentage of the settlement in the event they prevail. *See, e.g., Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 122–123, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (holding that a relator may collect a portion of a settlement agreement depending upon whether the Govern-

## D. Relators' Anti–Kickback Claims

■ Relators allege that Tenet violated the FCA by submitting claims for payment that were derived from illegal referral relationships in violation of the Medicare Anti–Kickback Statute, 42 U.S.C. § 1320a–7b. TAC ¶¶ 42, 46. The Medicare Anti–Kickback Statute prohibits 1) the solicitation or receipt of remuneration in return for referrals of Medicare patients, and 2) the offer or payment of remuneration to induce such referrals. *Thompson,* 125 F.3d at 901. In their complaint, Relators allege that Tenet offered medical directorships and reimbursement of office expenses as kickbacks to certain physicians in return for referrals to Tenet hospitals, all in violation of the Medicare Anti–Kickback Statute. TAC ¶¶ 34, 39, 41.

Nevertheless, Tenet argues that Relators have failed to meet Rule 9(b)'s pleading requirements because they fail to identify by name either the hospital employees or physicians who allegedly violated the Anti–Kickback Statute, the specific hospitals to which patients were referred in exchange for kickbacks, the dates regarding the allegedly illegal referrals, any single illegal referral made as a result of Tenet's kickbacks, or how the facts alleged resulted in a fraud on the Government. Def.'s Mot. 18–20. Relators counter by arguing that the requirements of Rule 9(b) should be relaxed as the number of patients referred and the specific dates of referral are information within Tenet's knowledge and control and the alleged fraud occurred over a multi-year period. Relators' Opp'n 12. Relators further argue that they have alleged the "who, what, when, where, and how" of the alleged fraud in that they alleged the following:

(1) the "who"—Tenet paid "certain physicians" including five oncologists, an infectious disease specialist, four members of the pulmonary group, group surgeons, two obstetricians/gynecologists, and four urologists,

(2) the "what"—Tenet paid certain physicians to induce referrals to Tenet facilities and these physicians made a high number of referrals,

(3) the "when"—that "payments had been made by Tenet to physicians since the 1980s, that four surgeons had received payments by Tenet from 1992 through 2002, that two obstetricians/gynecologists had received payments by Tenet from 1995 through 2002, and that benefits such as free or reduced rent were provided to certain oncologists in 1999,"

(4) the "where"—an unusually large number of patients were referred to Tenet facilities located some distance from the physicians' offices, and

(5) the "how"—Tenet knowingly presented or caused to be presented false claims for payment and created false records to obtain payment.

Relators' Opp'n 11–12.

Claims brought pursuant to the FCA must adhere to the strict pleading requirements set forth in Rule 9(b). *Dow Chem. Co.,* 343 F.3d at 329. At a minimum, Rule 9(b) requires that Relators set forth the " 'who, what, when, where, and how' of the alleged fraud." *Thompson,* 125 F.3d 899, 903 (5th Cir.1997). These pleading requirements are relaxed where the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge or when the alleged fraud occurred over a multi-year period. *Id.; United States ex rel. King v. Alcon Labs., Inc.,* 232 F.R.D.

ment intervened in their suit, and if so, how much the relator contributed to the prosecution of the claim).

568, 570, (N.D.Tex.2005). In such situations, fraud may be pled by alleging a belief under such circumstances. *Thompson*, 125 F.3d at 903. Nonetheless, the Fifth Circuit has held that this exception to Rule 9(b)'s requirements " 'must not be mistaken for a license to base claims of fraud on speculation and conclusory allegations.' " *Id.* Even where Rule 9(b)'s requirements are relaxed and the allegations are based on information and belief, the complaint must still set forth a factual basis for the belief. *Id.*

■ As a preliminary matter, this Court finds that Relators are not entitled to a relaxed pleading standard under Rule 9(b). Relators were "insiders" by virtue of the fact that they held directorships and/or held privileges with Tenet, and as such they had access to information upon which their claims depend. *United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 114 (W.D.Pa.2006) (distinguishing "insiders" from other relators by virtue of their ability to access the information upon which their allegations depend). However, even if this Court were to ignore Relators' insider status, their pleadings would still fail to satisfy Rule 9(b)'s relaxed pleading requirements.

■ Relators must, at the very least, set forth a factual basis for their beliefs. *Thompson*, 125 F.3d at 903. In the instant case, Relators' fail to do so with respect to several key elements. First, although Relators identify certain physicians allegedly involved in the fraud by specialty in an attempt to allege the "who," Fifth Circuit law indicates that this is insufficient to satisfy Rule 9(b). For example, in *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997), the Fifth Circuit affirmed the dismissal of a complaint when the relator "did not identify any specific physicians who referred patients for medically unneces-

sary services that were submitted by defendants." *Thompson*, 125 F.3d at 903.

Second, this Court finds that failure to specifically allege even one specific illegal referral does not comply with Rule 9(b)'s requirements to plead the "what and how" with specificity. As discussed in *United States ex rel. King v. Alcon Laboratories, Inc.*, 232 F.R.D. 568 (N.D.Tex.2005), a complaint must specifically identify the actual fraudulent transactions and the exact way in which the fraud was committed. *King*, 232 F.R.D. at 572. Finally, Relators' allegations that the fraudulent events took place at some point in the 1980s, between 1995 and 2002, and in 1999 are insufficient to meet Rule 9(b)'s requirements to plead the "when" with specificity. Even if this Court were to relax the pleading standards, which it does not, Relators would still need to allege at least approximate dates of the alleged fraud in a manner such that they appear to be more than mere speculation or conclusory allegations. *Thompson*, 125 F.3d at 903. This Court finds that Relators' extremely broad and vague allegations concerning the dates on which the alleged fraud occurred cannot meet this standard.

Because Relators have failed to meet Rule 9(b)'s pleading requirements, Tenet asks this Court to dismiss Relators' Anti–Kickback claim. Indeed, the Fifth Circuit has held that Rule 9(b) is applied "with force, without apology." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 178 (5th Cir.1997). Nonetheless, the Fifth Circuit has also held that Rule 9(b) must be read with Rule 8(f)'s requirement that "all pleadings shall be so construed as to do substantial justice." FED.R.CIV.P. 8(f); *Williams*, 112 F.3d at 178. In addition, case law indicates that courts allow relators at least some opportunity to plead with the requisite specificity before dismissing relators' claim(s). *See, e.g.,*

*Williams,* 112 F.3d at 180 (indicating that plaintiffs had been given at least two previous opportunities to plead with specificity); *King,* 232 F.R.D. at 573 (indicating that relator had already amended his complaint twice after having been notified of Rule 9(b) defects, and thus had "plenty of opportunity" to plead with specificity). In accord with these cases, this Court dismisses Relators' Anti–Kickback claim without prejudice to filing an amended complaint by no later than thirty (30) days after the issuance of this Order. If Relators fail to file an amended complaint curing the deficiencies, this Court will enter an order dismissing Relators' Anti–Kickback claim with prejudice.

### III. CONCLUSION

For the reasons set forth above, Tenet's Motion (Doc. No. 55) is **DENIED** as to the outlier claim and **GRANTED** as to the Anti–Kickback claim. Relators' Anti–Kickback claim is **DISMISSED** without prejudice to refiling an amended complaint by no later than thirty (30) days from the issuance of this order. Should Relators fail to file an amended complaint curing the Rule 9(b) deficiencies within said time limit, this Court will enter an order dismissing Relators' Anti–Kickback claim with prejudice.

**SO ORDERED.**